**STATE of Utah, Plaintiff and Appellee,**

v.

**Raymond PEREZ, Defendant and Appellant.**

**No. 960375–CA.**

Court of Appeals of Utah.

Sept. 11, 1997.

Kent E. Snider, Ogden, for Defendant and Appellant.

Jan Graham and Kenneth A. Bronston, Salt Lake City, for Plaintiff and Appellee.

Before WILKINS, Associate P.J., and GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Defendant appeals his convictions for one count of distribution of a controlled substance within 1000 feet of a prohibited place, a second degree felony, and one count of distribution of a controlled substance, a third degree felony. We affirm as to the second count, but remand for a new trial on the first count of distribution within 1000 feet of a prohibited place.

## FACTS

Because defendant is appealing from a jury verdict, we "recite the facts in a light most favorable to the jury's verdict, 'but present conflicting evidence to the extent necessary to clarify the issues raised on appeal.'" *State v. Vigil*, 922 P.2d 15, 18 (Utah Ct.App.1996) (citation omitted).

Defendant's convictions arose from two drug transactions between defendant and

Adam Black, a confidential informant. In January 1995, while on parole after being released from prison, Adam Black began contacting his parole officer, Blake Woodring, about other parolees who Black thought were violating parole and committing crimes. After Black's information led to several arrests, Officer Woodring suggested that Black apply to be a confidential informant. Black applied to and was eventually approved by the Board of Pardons and Department of Corrections to do undercover work. After he was approved, Black made several undercover purchases for the Weber–Morgan Narcotics Strike Force (Strike Force), working under Officer Lyle Bayles.

Black became acquainted with defendant while working at the Red Duck, a convenience store near defendant's apartment complex. Defendant often shopped at the Red Duck; Black also visited defendant at his apartment several times.

In October 1995, Black told Officer Woodring that defendant had offered to sell him drugs. Woodring contacted the Strike Force and arranged to use Black as a confidential informant to buy drugs from defendant.

On October 30, 1995, Black set up a drug buy with defendant at defendant's apartment. Because both Officer Woodring and Officer Bayles were out of town, Black called Officer Rodney Laplant, Woodring's partner, and told him what time Black was to buy the drugs. Laplant contacted Officer Mike Elliott of the Strike Force.

Before the buy, Black met Officers Laplant and Elliott at the Adult Probation and Parole Office (AP & P), where he was searched, given Strike Force money, and fitted with a wire. Black's car was also searched. Black then drove to defendant's apartment complex. The officers followed Black in separate cars and then parked nearby where they could see the apartment complex. From their vantage point, the officers saw Black park in the parking lot of the apartment complex and then walk to the apartment building. They were unable, however, to see which apartment Black entered; Black testified at trial that he went to defendant's apartment.

Although Black had been fitted with an electronic eavesdropping device, the transmitter was operating only intermittently, and the officers were therefore unable to hear the entire exchange. The officers heard Black knock on a door, and heard an unknown male answer the door. Black asked for defendant and was invited into the apartment. Black had a brief conversation with this man about buying some stereos. A couple of minutes later, defendant returned to the apartment. Black asked defendant if he had "his stuff," and defendant said that he did. The officers heard this portion of the conversation—both officers heard a "third voice" enter the conversation, and Officer Laplant recognized the voice as that of the defendant—but the transmitter then went out completely. Black testified that defendant again left the apartment for a few minutes, and when he returned he gave Black two bags of marijuana, and Black gave defendant $250.

Black then left the apartment and returned to his car. He drove to the AP & P parking lot, followed by the officers. Black was nervous about being seen there, so they drove to the Sheriff's office. Black gave the officers the marijuana, and he was researched by the officers. It was later determined that defendant's apartment was within 1000 feet of a church.

On November 13, 1995, a second transaction between defendant and Black took place. On the afternoon of November 13, Black called Officer Bayles and told him that he had arranged to buy drugs from defendant at the Red Duck later that day, while Black was working there. At the time the buy was to take place, Officer Bayles went to the Red Duck to fit Black with a wire and to give him Strike Force money for the drug buy; Officers Woodring and Laplant parked in a nearby parking lot where they could see the Red Duck and see everyone that entered or left the store. Officers Woodring and Laplant saw three people standing in the parking lot of the Red Duck, one of whom they believed to be defendant. Officer Bayles, however, had not previously met defendant, and so did not recognize him as he pulled into the parking lot.

As Officer Bayles entered the store, Black told him that defendant was entering the store right behind him. Black pretended that Bayles was an electrician who was there to do some repairs and took Bayles to a back room. There, Officer Bayles quickly searched Black, placed a wire on him, took his money, and gave him Strike Force money. Bayles then left the store and drove to an alley where he could see the Red Duck and monitor the exchange between Black and defendant. Once the wire was placed on Black, Officers Laplant and Woodring could hear the exchange between Black and defendant.

After Officer Bayles left the store, Black asked defendant if he had "the stuff." Defendant said that he did, and Black confirmed that defendant had an ounce of marijuana and a quarter gram of cocaine. Black testified at trial that defendant gave him a sock which defendant said contained the drugs, and Black paid defendant $250 or $260 for the drugs. Defendant then left the store, and the officers saw him walk up the hill toward his apartment.

After defendant left, Black told Officer Bayles over the wire to call him and gave him the telephone number to call at the Red Duck. When Officer Bayles called, Black said, "I've got it," and told Officer Bayles to "come pick it up." A few minutes later, the officers heard the telephone at the Red Duck ring again and heard Black answer the phone. Over the wire, the officers could only hear Black's side of the telephone conversation—they heard Black tell someone he had $90 left and heard Black refer to a quarter gram of crank. After hanging up, Black requested on the wire that the officers telephone him again.

At about this time, Black looked into the sock and found the cocaine was missing. He called to someone outside the store and told him defendant had "ripped him off." He then told this person to go to defendant's apartment and tell him to come back. When this person left, Officer Woodring telephoned Black. Black told Officer Woodring that there was no cocaine in the sock and that he

had been "ripped off." Officer Woodring asked about the other call, and Black said that another person was on his way to the store to sell him a quarter gram of crank.

The officers then saw another person enter the store, whom Black identified as the person he had spoken to on the telephone a few minutes earlier. While this person was still there, defendant entered the store. Black accused defendant of "ripping him off," which defendant denied, insisting he put the cocaine on the counter and not in the sock with the marijuana. They searched but were unable to find the cocaine. Defendant eventually promised to "take care of" Black,[1] and then left with the other individual. Officer Bayles then called Black and made arrangements to pick up the marijuana.

Defendant was charged with one count of distribution of a controlled substance within 1000 feet of a church based on the October 30 transaction, and one count of distribution of a controlled substance for the November 13 transaction.

At trial, defendant testified that although he knew Black, he did not sell drugs to him on either occasion. Regarding the October charge, defendant stated that he had answered the door himself and that there was nobody else in the apartment. Defendant further testified that he had tried to sell Black a stereo at that time.

Following the trial, the jury found defendant guilty of both counts. Defendant was sentenced to serve one term of one to fifteen years and a term of zero to five years, the terms to run concurrently.

## ANALYSIS

■ On appeal, defendant argues the State improperly bolstered Adam Black's credibility at trial before Black's credibility was attacked by the defense. Defendant acknowledges his trial counsel did not object to this bolstering of Black's credibility, but argues we should review this alleged error

---

1. Black testified that the following Saturday, defendant brought him a quarter gram of cocaine,

which Officer Woodring then picked up from Black.

under the plain error doctrine.[2] To establish plain error, defendant must show that: "(i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). An error is harmful if, "absent the error, there is a reasonable likelihood of a more favorable outcome" for the defendant, or "our confidence in the verdict is undermined." *Id.* at 1208–09.

## I. Bolstering the Credibility of a Witness

Rule 608 of the Utah Rules of Evidence provides that

> [t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Utah R. Evid. 608(a). The Rule further states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence." Utah R. Evid. 608(b).

Defendant asserts that in three instances the State improperly bolstered Black's credibility in violation of Rule 608 by commenting and eliciting testimony about Black's participation in other cases that resulted in arrests and convictions.

First, defendant argues that in the State's opening statement the prosecutor made improper remarks which were intended to bolster Black's credibility. In opening statement, the prosecutor stated that in January 1995, Black told his parole officer, Officer Woodring, that

> [a] lot of people are beginning to approach me and doing various things and offering to sell me stolen property, offering to sell me drugs. And by the way, there is some

guy up there running around right now who I think is trying to palm forged checks off on me.

> Blake Woodring asked [Black] about the last of the matters, who is this guy? Can you help us with him? With no agreement for him to be an undercover [a]gent or anything, he simply gave the parole department the information about this person from Oregon who was passing bad checks. As it turns out, he is a person who was wanted in three different states, and has been convicted of 11 separate counts of forgery in three different states. And ended up getting Blake Woodring a medal from the Department of Corrections over his assistance in catching this guy. That's how the Parole Department found out about him.

The prosecutor also stated:

> You cannot use a parolee as an undercover agent just on the decision of a parole agent. It is prohibited by the Corrections Department. But because of all of the information that Adam Black kept giving the Parole Department, and because of the fact that all of this information was turning out to be good information, Blake Woodring applied to the administrative offices in Salt Lake to permit Adam Black to work undercover.

Defendant further argues that the prosecutor elicited improper bolstering testimony during the direct examination of two State witnesses who testified before Black. Defendant first cites the following exchange between the prosecutor and the State's first witness, Officer Woodring, as improper bolstering:

> Q: In January ... of 1995, did your relationship with Mr. Black change?
>
> A: Yes.
>
> Q: Describe for the Jury what happened in that time[.]
>
> A. In January of 1995 Mr. Black came into my office. He informed me at that

---

**2.** Defendant alternatively asserts that, even if the trial court did not commit plain error in allowing the State's bolstering statements and testimony, defendant was denied effective assistance of counsel because his trial counsel failed to object to the bolstering. However, based on our resolution of this case under the plain error doctrine, we do not reach defendant's ineffective assistance argument.

time that he had a person staying with him off and on who was a parole fugitive and probation fugitive. He was a parole fugitive from the State of Oregon and probation fugitive from Salt Lake City. He was cashing forged checks at that time. He stated that this individual had shown him how he was doing it, and was cashing checks now in the Ogden area.

He was aware that Mr.—that the individual's name was Raymond Lindbrick, had done about ten checks here in the Ogden area. [With] [o]ne of those checks he was able to obtain a brand new Toyota Corolla. Mr. Black gave me information where he was hanging out, the various drug houses he was going to to purchase substances.

Based upon the information Mr. Black provided to me, I was able to do surveillance and find the individual. Followed his vehicle, pulled it over, and took him into custody. And confiscated evidence that led to convictions in the States of Washington, Oregon and Utah.

Q: Did you receive any award for that?

A: Yes, I did. I received a medal of merit provided by the Department of Corrections.

. . . .

Q: ... Now after January of 1995 when this information was given to you, did Adam Black continue to give you information?

A: He did. Mr. Black has a unique ability to talk to people and gain their trust. Over the next few months he would let me know—he would come and ask me if certain individuals were on the run, if they were fugitives from justice, and provided me information on various fugitives in the Ogden area.

Q: Did that information turn out to be correct or incorrect insofar as you were able to check it?

A: The majority of the time it was correct information. . . .

. . . .

Q: And was that information that he was giving you leading to the capture of people?

A: O[n] some occasions, yes. The other occasions it didn't materialize.

Q: Did you ever find he wasn't telling the truth?

A: No, I found his statements to be true.

Second, defendant cites Officer Rodney Laplant's testimony on direct examination, which also preceded Black's testimony, as improperly bolstering Black's credibility:

Q: And have you had any more to do with Adam Black as pertains to this defendant since that day [November 13]?

A: Well, with Adam, yes. I have dealt with Adam. I have also dealt with Ray up to the point he went back to the prison.

Q: Okay. You didn't make any more buys from him after that insofar as you know?

A: As far as I know, there was one additional buy, but the clarity there is, you know—

Q: Did you continue to work with Adam?

A: Yes.

Q: How many different cases[ ]?

A: Numerous different cases.

Q: How many different times did you go along like you have described on these two cases?

A: Just about every one of them. I think I only missed two or three, maybe not even that many. I mean I was there on—I was one of the controlling officers through the whole thing.

Q: And Adam did a lot of people?

A: Yes, he did.

Q: Is that fair?

A: Yeah, he did. He did a lot of people. Not just in that one area, but he did numerous people in Ogden.

Q: And many of them are now in prison?

A: Yes.

Defendant cites *State v. Hovater*, 914 P.2d 37 (Utah 1996), to support his argument that this testimony and the remarks of the prosecutor quoted above were improper bolstering in violation of Rule 608. In *Hovater*, the defendant, who was charged with distribution of illegal drugs, asserted that he was denied effective assistance of counsel based on his

trial counsel's failure to object to bolstering testimony similar to that in this case. *See id.* at 39. At trial, the prosecutor in *Hovater* asked the State's first witness, a police officer, "about the reliability of [the State's confidential informant] and specifically asked [the officer] about the informant's involvement in other cases" which had led to convictions. *Id.* at 40. The defendant argued that the witness's "testimony concerning other convictions secured in part by the use of [the informant] was adduced for the purpose of bolstering [the informant's] credibility in clear violation of rule 608(a) of the Utah Rules of Evidence." *Id.* at 41. In response, the State argued that the testimony was properly elicited because the informant's credibility had been attacked in the defendant's opening statement. In so arguing, the State asserted that an attack made in an attorney's opening statement "can trigger the resuscitation of the attacked witness's credibility." *Id.*

The supreme court declined to consider whether an attack in opening statement can trigger rehabilitation of a witness's credibility. *See id.* Instead, the court concluded that the defendant in *Hovater* did not attack the informant's character for truthfulness in opening statement. *See id.* The supreme court further concluded that even if the informant's credibility had been attacked in opening statement, the State erred in bolstering the informant's credibility because the State asked its witness about specific instances in which the informant helped secure convictions of other suspected drug dealers. *See id.* Specifically, the prosecutor asked in direct examination "how many other persons were arrested, charged, and actually convicted with [the informant's] help," and asked "if any of these persons ever claimed that [the informant] 'attempted to plant drugs on them.'" *Id.* at 42. The court stated that "this was extrinsic evidence offered to support the credibility of another witness in clear violation of rule 608(b). As such, the testimony was improper." *Id.* The court therefore concluded that defendant's counsel was deficient in failing to object to evidence "so clearly in violation of rule 608(b)." *Id.*

In this case, the State concedes the testimony elicited from Officers Woodring and Laplant on direct examination about the confidential informant's useful information leading to arrests and convictions, and the prosecutor's similar references in opening statement, were "substantially the same as the officer's [bolstering testimony] in *Hovater*." However, the State asserts that, unlike *Hovater*, the State's bolstering of Black's character for truthfulness was permissible because his credibility was attacked in defendant's opening statement.[3] In so arguing, the State asserts that this court should adopt the rule recognized in other jurisdictions that remarks in opening statement may trigger the rehabilitative provisions of Rule 608.[4] *See id.* at 41 (citing

---

**3.** In defendant's opening statement, defense counsel referred to Black as having been in prison on a burglary charge, and as getting his "restitution paid off" and "getting off parole" in return for giving the police information. Defense counsel also stated that Black did not have "an honest background," and questioned whether he was "someone that we want to trust."

**4.** The State also argues that the challenged testimony and prosecutor's comments in opening statement were appropriate because the defendant's attack on Black's credibility could reasonably be anticipated. To support this argument, the State asserts that other courts have held that "where the bolstering material also contains the basis for the opposing party's impeachment, admission of the evidence has generally been upheld." However, in this case, the evidence that was used to bolster Black's credibility—i.e., evidence that Black gave the officers information that had led to a number of arrests and convic-

tions—was not the same evidence used to impeach—i.e., evidence that Black had been in prison on a burglary charge, was on parole, received money for his information, and was getting his restitution paid off by the State. Further, the cases cited by the State in support of its argument deal with the specific situation of the anticipatory introduction of a plea agreement condition to testify truthfully, and are therefore inapposite to this case. *See, e.g., United States v. Lord,* 907 F.2d 1028, 1029, 1030 (10th Cir.1990) (stating "majority of circuits allow the government to admit evidence of the truthfulness provisions of an agreement on direct examination of a witness, prior to any challenge to the witness's credibility" and that "[t]hese courts have noted that evidence concerning a plea agreement and its provisions may have both a bolstering and an impeaching effect on the witness's credibility"); *United States v. Townsend,* 796 F.2d 158, 163 (6th Cir.1986) (stating "majority of the courts that have considered this issue have held that

cases holding "bolstering evidence is admissible following an attorney's disparagement of a witness's credibility during the attorney's opening statement").

■ However, even if we were to adopt this rule and to conclude that because the defense attacked Black's credibility in its opening statement, the prosecutor was entitled to rehabilitate Black's credibility by eliciting bolstering testimony from the officers on direct examination, a more fundamental problem remains arising from the prosecutor's bolstering comments in the State's opening statement. In opening statement, the prosecutor referred to Black's help in a specific forgery case, in which Black helped the police "catch[ ] this guy ... who was wanted in three different states." The prosecutor also referred to Black as aiding the police by volunteering information which was "all ... turning out to be good information." These bolstering comments necessarily preceded any attack on Black's character by the defense.

In arguing that these comments were not improper, the State suggests that the prosecutor did not improperly bolster Black's credibility in the State's opening statement, "but merely provided the jury with an overview of the facts the State intended to prove during its case-in-chief." Thus, the State asserts that "the central question is whether the prosecutor's remarks properly referenced properly admitted evidence." We disagree.

■ "The purpose of an opening statement is to apprise the jury of what counsel intends to prove in his own case in chief by way of providing the jury an overview of, and general familiarity with, the facts the party intends to prove." *State v. Williams,* 656 P.2d 450, 452 (Utah 1982). This does not mean that the State can refer to evidence it *may* introduce on rebuttal based on its expectation that the defense will introduce certain impeaching evidence. As the Utah Supreme Court stated in *Williams,* "an opening statement should not be argumentative. It is not proper to engage in anticipatory rebut-

tal or to argue credibility by referring to impeachment evidence the other side may adduce." *Id.*

The State, however, argues that this case is distinguishable from *Williams,* apparently suggesting that the language in *Williams* that anticipatory rebuttal is improper in opening statement is thus inapplicable to this case. In *Williams,* the prosecutor asserted in opening statement that the key state witness, who had accompanied the defendant in the offense, "had been coerced into signing a statement exculpating" the defendant. *Id.* The prosecutor also noted that the written statement was in the defense counsel's possession. *See id.* However, neither the State nor the defense ever introduced this statement into evidence at trial, nor did the defendant rely on the statement to impeach the witness's testimony. *See id.*

■ The State points out that here, by contrast, although the State bolstered Black's credibility in opening statement, Black's credibility was attacked at trial by defendant, and the prosecutor's statements were "later proven through the testimony of Officers Woodring and Laplant during the State's case without challenge to its accuracy." This argument suggests that, contrary to the supreme court's language in *Williams,* anticipatory rebuttal is proper if it turns out to be warranted and if the evidence adduced at trial supports the opening statement. However, the State offers no authority for this proposition and we refuse to adopt such a rule.

Moreover, the State's argument is circular because if the State engages in anticipatory rebuttal in its opening statement, the defendant will likely be forced to counter the State's comments by introducing impeaching evidence, which the State could then point to as justifying its anticipatory rebuttal. This circularity also defeats the State's argument that the bolstering testimony elicited by the prosecutor in this case on direct examination was appropriate as the defense first attacked Black's credibility in opening statement. Because the State engaged in "anticipatory re-

elicitation during direct examination of a plea agreement containing a promise to testify truth-

fully does not constitute impermissible bolstering of the witness's credibility").

buttal" in its own opening statement, it is impossible for this court to determine whether, in the absence of such anticipatory rebuttal, the defense would have attacked Black's credibility in opening statement. Thus, we cannot agree that the State was entitled to bolster Black's credibility based on the defense's attack on Black's credibility in opening statement.

■ Because the prosecutor's remarks in opening statement and the bolstering testimony of State witnesses on direct examination could not properly be justified as attempts to rehabilitate Black's character after it was attacked, the bolstering statements and testimony were improper and the trial court erred in allowing the bolstering. Further, based on both the express language of Rule 608, which clearly provides that a witness's credibility may not be bolstered before it is attacked, and the Utah Supreme Court's language in *Williams* expressly stating that anticipatory rebuttal is improper in opening statement, we conclude that this error should have been obvious to the court.

## II.  Prejudice

■ To succeed on a plain error claim, defendant must show not only that the trial court erred and that the error should have been obvious to the court, but also that the error was harmful. Specifically, defendant must show that "absent the error, there is a reasonable likelihood of a more favorable outcome" for defendant. *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993).

In *Hovater,* as discussed above, the supreme court concluded that the prosecutor improperly elicited bolstering testimony on direct examination of the State's first witness, and that by failing to object to this testimony defendant's trial counsel performed deficiently. *See State v. Hovater,* 914 P.2d 37, 42 (Utah 1996). However, the court found that the defendant did not establish that prejudice resulted from his counsel's

deficient performance. *See id.* at 43. The defendant in *Hovater* argued that "the crux of the case" was the informant's testimony that the defendant sold drugs to the informant and an officer "against his and his wife's testimony that he did not." *Id.* The supreme court disagreed, stating:

> the record reveals that the case against Hovater was not based solely upon [the informant's] testimony, but rather, upon the testimony of both [the officer and the informant]. *Even without [the informant's] testimony, the jury had sufficient evidence to convict [the defendant] on the sole basis of [the officer's] testimony, along with the expert testimony that the substances received from [the defendant] were methamphetamine.*

*Id.* (emphasis added). Thus, the court concluded that "any bolstering of [the informant's] credibility had, at most, an isolated impact on the case," which was not enough to establish prejudice. *Id.*

In this case, the State likewise asserts that even if there was error, there was no prejudice to defendant because "evidence of defendant's guilt was compelling even without the confidential informant's testimony." The defendant, on the other hand, claims that Black's testimony was uncorroborated as to the first transaction—making the case rest upon Black's word against defendant's—and therefore the error in bolstering Black's credibility was harmful as to his second degree felony conviction.[5] The State disputes this, arguing that the record shows the case against defendant was based on the testimony of Black as well as Officers Woodring, Elliott, Laplant, and Bayles, all of whom corroborated Black's testimony. The State asserts that, as in *Hovater,* "even without Black's testimony, the jury had compelling evidence to convict defendant on the basis of the officers' testimony along with expert testimony . . . that the substances received from defendant were marijuana."

---

5.  Defendant's counsel conceded at oral argument that there was no prejudice with respect to the third degree felony conviction arising from the second transaction on November 13. Our review of the record likewise indicates that there was sufficient evidence, even absent Black's testi-

mony, to support defendant's conviction based on the second incident. Therefore, there was no prejudice with respect to defendant's third degree felony conviction resulting from the improper bolstering statements and testimony, and we affirm this conviction.

The State's assertion that there was compelling evidence to convict defendant even without Black's testimony is not supported by the record. Our review of the record shows that Black's account of the October 30 transaction was not fully corroborated.

As recited in the facts above, this first transaction occurred at defendant's apartment building. Officers Laplant and Elliott testified that they were able to see Black park his car and approach the apartment building, but they then lost sight of him. Thus, neither officer was able to see which apartment Black entered or to observe the actual transaction. In addition, although the officers had placed a wire on Black, the transmitter was "going in and out," so the officers were unable to hear everything that occurred. The officers testified that they heard Black knock on a door, and then heard Black ask for defendant. They heard an unknown male invite Black into the apartment. After a few minutes, the officers heard a third voice enter into the conversation. One of the officers recognized this third voice as that of the defendant. They heard Black ask "if he had his stuff," to which defendant responded, "Yes, I do." The wire then went dead. About five to fifteen minutes later, the officers saw Black leave the apartment, and the officers followed him in their cars to a place where they could search him. They recovered two packets of marijuana from Black.

Thus, although the officers were able to corroborate some of the details surrounding the first transaction (such as Black's statement, which conflicted with defendant's testimony at trial, that defendant did not answer the door and that there was a third person in the apartment), there was no corroboration of the crucial part of the transaction—the actual exchange of money for drugs from defendant. As one of the officers testified,

"the wire cut out before there was any conversation that I would consider extremely significant as far as mention of narcotics or price." Instead, the officers—and the jury—had to rely on Black's testimony that he was in defendant's apartment and that he bought the drugs from defendant and not from another person (such as the third person in the apartment) to establish defendant's guilt. Unlike *Hovater*, without Black's testimony, there is insufficient evidence in the record to support defendant's conviction for the first count.[6]

Because the State's case against defendant regarding the first count depended on Black's testimony, absent the State's improper bolstering of Black's credibility there was a reasonable likelihood of a more favorable outcome for defendant. *See United States v. Taylor*, 900 F.2d 779, 782 (4th Cir.1990) (holding trial court's error in allowing improper bolstering of informant's credibility in drug possession case resulted in prejudice because tape of alleged drug transaction was of poor quality and inconclusive, and because no police officer had actually seen defendant in possession of drugs, thus making informant "the key to any case the government had against" defendant). Thus, the trial court's error in allowing the improper bolstering was prejudicial as to the first count of distribution of a controlled substance within 1000 feet of a prohibited place, and defendant is entitled to a new trial with respect to his second degree felony conviction.

## CONCLUSION

The trial court committed plain error in allowing the prosecutor to bolster the State's confidential informant's credibility in opening statement and in allowing the prosecutor to elicit bolstering testimony on direct examination. This error was prejudicial with respect

6. By contrast, in *Hovater*, in addition to the informant's testimony, an officer "testified from his own personal knowledge" that (1) he and the informant had gone to the defendant's home to try to buy drugs from the defendant; (2) when they arrived, the informant, without any drugs, went into a bedroom alone with the defendant to try to buy drugs; (3) after a short time, the informant returned from the bedroom with drugs; (4) after the informant handed the officer the drugs, the officer gave the defendant $50 for the drugs; and (5) the defendant told the officer he could return another time to buy more drugs. *State v. Hovater*, 914 P.2d 37, 43 (Utah 1996). Further, the defendant in *Hovater* did not deny that the drugs were at his house, that he told his wife to "retrieve the drugs which his guests took, and that he received $50 from one of his guests." *Id.*

to defendant's second degree felony conviction because the informant's testimony as to the crucial part of the transaction was uncorroborated. However, the error was not prejudicial with respect to defendant's third degree felony conviction. Accordingly, we affirm as to defendant's third degree felony conviction, but reverse and remand for a new trial on the second degree felony conviction.

WILKINS, Associate P.J., and GREENWOOD, J., concur.