STATE of Wisconsin, Plaintiff-Respondent,

v.

Troy D. MOORE, Defendant-Appellant.

Court of Appeals

*No. 01–1737–CR. Submitted on briefs February 12, 2002.— Decided August 15, 2002.*

2002 WI App 245

(Also reported in 653 N.W.2d 276.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Suzanne Hagopian*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Christopher G. Wren*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. LUNDSTEN, J. Troy D. Moore was tried before a jury and convicted of delivery of a controlled substance as a second offense and possession of a controlled substance without a tax stamp. Moore asserts the trial court erroneously admitted character evidence in support of a State's witness at trial. We affirm.

## BACKGROUND

¶ 2. Because Moore complains that the trial court erroneously admitted evidence during trial, we need only set forth trial arguments and evidence.

¶ 3. To avoid drug charges, John Pearson agreed to cooperate with police efforts to detect other drug dealers. Pearson testified that he agreed to make con-

trolled buys from four individuals and to testify in court if required. In return, Pearson would face no jail time or probation. Without the deal, Pearson felt he would face a prison sentence. As part of this agreement, Pearson participated in a controlled purchase of marijuana from defendant Moore.

¶ 4.　On March 11, 1999, police fitted Pearson with a radio transmitter. They also searched Pearson and his van. Police then gave Pearson $1000 in pre-recorded bills and followed him to Moore's apartment building. Pearson entered the apartment building while police watched and monitored the radio transmission. Over the transmitter, officers recognized Pearson's and Moore's voices. They also heard a woman's voice, later identified as Moore's wife, Adrianne Moore.

¶ 5.　While Pearson was in the apartment building, two officers observed a man coming from the back of the apartment building and saw him enter a nearby garage. Police later determined that Moore rented that garage. The man returned to the apartment building with a brown paper bag. One of the officers identified the man as Moore. Another officer testified that the man was of the same race and had the same build as Moore. While this man was outside the apartment building, police monitoring the transmitter did not hear Moore's voice.

¶ 6.　Shortly after the man returned to the building from the garage, Pearson left the apartment building and gave the officers a brown paper bag similar in size, color, and texture to the bag carried by the man from the garage to the apartment building. The bag contained a pound of marijuana. Police searched Pearson and his van and did not find the pre-recorded bills. The paper bag was never examined for fingerprints.

¶ 7. Testifying about this event, Pearson said he entered the apartment building and went to Moore's apartment. Pearson said Moore took the $1000 in payment for drugs Pearson had previously acquired from Moore. Pearson said after Moore accepted the money, Moore left the apartment and returned three or four minutes later with a brown paper bag containing a brick of marijuana, which Moore, as was their custom, "fronted" to Pearson; that is, Moore gave Pearson the marijuana expecting payment later.

¶ 8. Eleven days later, police gave Pearson another $1000 in pre-recorded bills to pay for the marijuana Pearson received on March 11, and instructed Pearson to acquire additional drugs from Moore. Again police fitted Pearson with a transmitter and monitored Pearson as he entered Moore's apartment building. A police officer monitoring the transmission said there was significant static, but stated that he heard "those two talking about the fact that Mr. Moore said that he moved everything from his apartment to Janesville, and that if Mr. Pearson wanted something, that he needed to meet him in Janesville about 8:00 or 8:30 at Mercy Hospital." Pearson returned without the money and without any marijuana or other drugs.

¶ 9. Regarding this second event, Pearson testified that when he entered Moore's apartment, he gave Moore the money for the marijuana Pearson received on March 11. Pearson said Moore told him he was nervous about a drug bust that occurred at "Lear Seating" where Moore and Pearson worked, and that Moore had moved his "stuff" to Janesville. Pearson testified that Moore told Pearson to meet Moore at a hospital in Janesville that evening.

¶ 10. A few minutes after Pearson left Moore's apartment the second time, police entered Moore's

apartment and executed a search warrant. Police found the $1000 in pre-recorded bills that Pearson gave Moore a few minutes earlier, a finger scale, and a marijuana pipe. The police also searched the garage where, during the prior controlled buy, they had observed the man, identified by one officer as Moore, fetch the brown paper bag. The garage contained a car owned by Moore. Particles of marijuana were found on the front seat and hood of Moore's car.

¶ 11. Moore did not testify. However, Moore's wife, Adrianne, testified that when Pearson came to their apartment on March 11, Pearson did not exchange anything with Moore and that Moore never left the apartment while Pearson was there. Regarding the second visit, Adrianne testified that Pearson gave Moore $1000, but contended it was to repay a loan. Police monitoring the two interactions between Pearson and Moore did not hear any discussion about Moore lending Pearson $1000, but could not hear everything that was said due to static and poor equipment.

¶ 12. During opening argument at trial, Moore's attorney alleged that Pearson "faked a drug deal" and called Pearson an "admitted drug dealer and liar." Moore's attorney claimed that the defense would put on evidence showing that Pearson was "dishonest and manipulative." During direct examination, and over defense objection, the trial court permitted three police officers to testify that Pearson provided reliable information in the past resulting in the arrest of other drug dealers. One officer testified that police used Pearson "in purchasing cocaine from two individuals which we ended up arresting for that, and he had made two other controlled purchases from this individual prior to these individuals' arrest." Another officer testified, "I never learned of anything that [Pearson] has lied to me

about." During closing argument, four times the prosecutor referred to the officers' testimony about Pearson's honesty and reliability.

## CHARACTER EVIDENCE

¶ 13. Moore argues that the officers' testimony about Pearson's prior activities indicating reliability was inadmissible character evidence under Wis. Stat. § 906.08 (1999–2000).[1] The State tacitly admits error by failing to respond to this argument. The State's admission is appropriate.

¶ 14. Wisconsin Stat. § 906.08(2) reads, in pertinent part:

> SPECIFIC INSTANCES OF CONDUCT. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, ... may not be proved by extrinsic evidence. They may, however, subject to s. 972.11(2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

¶ 15. This rule prohibits bolstering a witness's credibility with extrinsic evidence on a collateral matter. *See State v. Rognrud*, 156 Wis. 2d 783, 787, 457 N.W.2d 573 (Ct. App. 1990). Yet, in this case, the State presented extrinsic evidence solely to bolster Pearson's credibility. The officers' testimony that Pearson's assistance led to the arrest of other individuals on drug charges was extrinsic evidence offered and used to

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

support Pearson's credibility. Thus, the trial court improperly overruled the defense objection, and we will now consider whether the error was harmless.[2]

## HARMLESS ERROR

■

¶ 16. Recently, in *State v. Harvey*, 2002 WI 93, 254 Wis. 2d 442, 647 N.W.2d 189, the supreme court adopted the formulation of the harmless error test used by the United States Supreme Court: "error is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Id.* at ¶ 49 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). There is nothing in *Harvey* to suggest that this language constitutes a substantive change in Wisconsin's harmless error test. The court's prior articulation of the test was frequently summarized as follows: "whether there is a reasonable possibility that the error contributed to the conviction. A reasonable possibility is a possibility sufficient to undermine our confidence in the conviction." *State v. Williams*, 2002 WI 58, ¶ 50, 253 Wis. 2d 99, 644 N.W.2d 919 (citations omitted). When determining whether error is harmless, the reviewing court considers the entire record. *State v. Patricia A.M.*, 176 Wis. 2d 542, 556–57, 500 N.W.2d 289 (1993).

---

[2] The State argues that we may affirm the admission of the character evidence on an alternative ground not relied on by the trial court. The State asserts the disputed evidence was admissible other acts evidence under WIS. STAT. § 904.04(2). We observe that the disputed evidence was offered, accepted, and argued as exactly the sort of character evidence prohibited by WIS. STAT. § 906.08. However, because we conclude the admission of the disputed evidence was harmless, we choose not to address the State's alternative ground argument further.

¶ 17. Moore argues that the officers' testimony was prejudicial because the State's case hinged on Pearson's credibility. Moore points out that the prosecutor relied on the inadmissible character evidence four times during closing argument and that the character evidence likely carried great weight with the jury because it came from veteran police officers. Moore contends that the remainder of the State's case was flawed. Moore says the paper bag evidence is suspect because no fingerprint evidence linked him to the bag. Moore points out that only one of two officers was able to identify him as the person who obtained the paper bag from the garage. And, Moore contends the State failed to rebut the defense theory that Pearson planted the pound of marijuana somewhere in Moore's building and retrieved it as he left the building.

¶ 18. Moore's defense was farfetched. Moore's attorney argued that Pearson framed Moore by acquiring and planting a pound of marijuana in the apartment building prior to arriving at the building with the police. Moore argues on appeal that the jury might have believed that Moore thought Pearson came to Moore's apartment to repay a loan. However, this defense theory fails to explain the man matching Moore's description who went to Moore's garage and retrieved a bag that looked just like the bag of marijuana that Pearson brought to the police and the fact that Moore's voice could not be heard during the time this man was retrieving the bag from Moore's garage. It also fails to explain why police found marijuana particles covering the front seat and on the hood of Moore's car, in the same garage from which the man retrieved the paper bag. The only alternative explanation was so speculative that Moore's counsel did not even suggest it during closing argument: that Pearson recruited an accom-

plice matching Moore's description. However, there is absolutely no evidence that Pearson found a person who not only looked like Moore, but was also willing to risk being arrested on drug or obstruction of justice charges.

¶ 19. Moore further argues that the transmitter provided a poor recording of the events. Moore cites *State v. Perez*, 946 P.2d 724 (Utah Ct. App. 1997), as a case where a transmitter's poor quality led an appellate court to conclude the defendant was prejudiced. However, in *Perez*, the officers were only able to verify that the informant spoke with the defendant, and were unable to confirm any other details surrounding the alleged narcotics transaction. *Id.* at 733. In stark contrast, the police here were able to independently corroborate several aspects of Pearson's testimony.

¶ 20. The totality of the record supports our conclusion that it is clear beyond a reasonable doubt that the jury would have found Moore guilty absent the erroneous admission of character evidence.

*By the Court.*—Judgments affirmed.