COURT OF APPEALS
DECISION
DATED AND FILED

December 23, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP126-CR**

Cir. Ct. No. **2016CF296**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

NESTOR LUIS VEGA,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Portage County: ROBERT J. SHANNON, Judge. *Reversed and cause remanded with directions.*

Before Blanchard, P.J., Fitzpatrick, and Nashold, JJ.

¶1 FITZPATRICK, J. Nestor Luis Vega was arrested after an informant told law enforcement officers that he purchased heroin from Vega on five separate occasions. Vega was charged with: five counts of delivery of

heroin; felony possession of tetrahydrocannabinol (THC); maintaining a drug trafficking place; and two counts of felony bail jumping. Vega pled no contest to possession of THC and the bail jumping charges, and the case proceeded to trial in the Portage County Circuit Court on the remaining charges.

¶2  At trial, the State sought to prove that Vega sold heroin to the informant during each of five controlled purchases. In support, the State presented testimony from the informant and two officers involved with organizing the alleged controlled purchases. Vega testified in his own defense and asserted that he had never sold heroin and indicated that the informant was not telling the truth. On cross-examination, the prosecutor asked Vega three questions regarding Vega's exercise of his right to remain silent after his arrest, including Vega's decision not to provide his exculpatory version of events to the police. The circuit court overruled Vega's objection to these questions, and the prosecutor proceeded to ask another three questions on the same subject. The jury found Vega guilty on all counts.

¶3  Vega filed a postconviction motion seeking a new trial on the ground that his constitutional rights were violated because the prosecutor questioned him at trial about his exercise of his right to remain silent after he had been arrested and was read the *Miranda*[1] warnings. The circuit court denied Vega's motion, stating that the questions did not violate Vega's constitutional rights and, even if those questions did, the error was harmless because the jury would have found

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (holding that a person taken into custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

Vega guilty absent the questions. Vega appeals his judgment of conviction and the circuit court's order denying his postconviction motion.

¶4     For the following reasons, we conclude that Vega is entitled to a new trial. First, the prosecutor's questions regarding Vega's exercise of his constitutional right after he was arrested violated Vega's due process rights. Second, those constitutionally prohibited questions were not harmless error because the State has not met its burden to prove beyond a reasonable doubt that those questions did not contribute to the jury's verdict. Accordingly, we reverse Vega's judgment of conviction with respect to the counts relating to delivery of heroin and maintaining a drug trafficking place and the circuit court's order denying Vega's postconviction motion, and remand this matter for a new trial.

## BACKGROUND

¶5     As noted, and as pertinent to this appeal, Vega was charged with five counts of delivery of heroin and maintaining a drug trafficking place, and the case proceeded to trial on those charges.

### I. Trial Evidence.

¶6     The State presented testimony from two law enforcement officers with the Stevens Point Police Department which we now summarize. The officers testified that police asked Michael Gershon, an informant, to attempt to purchase heroin from Vega and he agreed to do so on five separate occasions over the course of ten days. Prior to each occasion, Gershon called Vega to set up a meeting, and law enforcement did not record or listen in on any of those calls.

¶7     Also prior to each occasion, the officers provided Gershon with prerecorded money and searched him in an attempt to ensure that he was not

3

carrying any other money, controlled substances, or weapons. Gershon was not searched under his clothing or asked to remove his shoes during each search. On each occasion, the police fitted Gershon with a recording device to record Gershon's interactions with Vega. The officers then drove Gershon to a location, usually Vega's residence. During each occasion, Gershon walked from the officer's vehicle, met with Vega out of sight of the police, then walked back to a predetermined location and gave heroin to the officers that Gershon said he had just purchased from Vega. Each package of heroin that Gershon handed over to the officers was described as being the size of a "big kernel of corn" or "half of the size of a marble." A controlled substance analyst from the Wisconsin State Crime Lab testified at trial that the substances delivered by Gershon to the officers contained heroin. The State did not test the heroin packages delivered by Gershon to the police for Vega's fingerprints or DNA.

¶8 Five days after the final time Gershon met with Vega, officers stopped Vega's vehicle, placed him under arrest, read the *Miranda* warnings to Vega, and searched Vega and his vehicle. The police also obtained a warrant to search his residence, and the search of the residence was conducted on the same day Vega was arrested and his vehicle was searched. The officers discovered marijuana and marijuana-related items during these searches, but did not find heroin or other evidence indicating the sale or distribution of controlled substances. None of the pre-recorded money that the officers gave to Gershon was recovered in the searches.

¶9 Pertinent to this appeal, Gershon testified that one reason he began working as an informant was because he was being investigated for theft and needed to buy back stolen items that he had sold to Vega. Gershon agreed to conduct controlled purchases of heroin from Vega in exchange for law

enforcement providing the funds for Gershon to purchase the stolen items from Vega.

¶10    During Gershon's testimony, the prosecutor played audio recordings of each meeting—as well as some video recordings that were taken from outside of Vega's residence—and asked Gershon to describe the events that were occurring on the recordings. The voices of Gershon, Vega, and the officers could be heard at times on the audio recordings, but the voices were usually muffled.[2] Gershon testified to his recollection and interpretation of the recorded conversations with Vega. However, the audio recordings played for the jury did not contain any intelligible dialogue between Gershon and Vega that referenced heroin. Further, while the video recordings showed Gershon approaching Vega's residence, none of those recordings depicted an exchange of money or heroin between Vega and Gershon.

¶11    Vega called Naila Santiago, his long-term girlfriend, as a witness. Santiago testified that she did not allow heroin in the home she shared with Vega and had never seen Vega possess or sell heroin. She also stated that Gershon would occasionally visit the house and play video games with Vega, but she admitted that she could not remember every time Gershon had come to the house and was not always aware of what Gershon and Vega were doing when Gershon visited.

---

[2] The State, in briefing in this court, mentions that the audio recordings of the alleged transactions between Gershon and Vega were played for the jury. However, the State does not attempt to quote from those audio recordings and, instead, the State relies on Gershon's recollections and his interpretations of the recordings. We observe that the circuit court, outside the presence of the jury, stated that the audio recordings were "virtually unintelligible from my perspective, which is exactly the same perspective as this jury has."

¶12     Vega testified in his own defense. On direct examination, Vega testified that he had never possessed or sold heroin and denied giving heroin to Gershon on the dates of the alleged controlled buys. Vega testified that Gershon was a friend who sometimes visited Vega's residence to smoke marijuana and play video games. Vega further testified that he had met with Gershon on each of the days that Gershon said he bought heroin from Vega. According to Vega, the purpose of each of these visits was not for Gershon to purchase heroin from Vega. Rather, the purposes were for Gershon to pay Vega for both a tool set and other property, and for Gershon to look for cigarettes and a food stamp card that Gershon said he dropped at Vega's residence.

¶13     On cross-examination, the prosecutor asked Vega a series of questions regarding his exercise of his right to remain silent after his arrest. The following exchange occurred during this line of questioning:

> [Prosecutor]. Now, I'm assuming that on June 27th or into the early morning hours of June 28th when you were taken into custody Detective Schultz must have approached you to talk about what was going on, right?
>
> [Vega]. On the 27th?
>
> [Prosecutor]. After the traffic stop when you were arrested.
>
> [Vega]. No. He came by -- He -- He read me my rights and told me that I was being arrested for five controlled buys.
>
> [Prosecutor]. All right. So I'm assuming at some point -- Okay. So did he tell you the reason for you being placed under arrest was for selling heroin?
>
> [Vega]. Correct.
>
> [Prosecutor]. All right. And I'm assuming, based on your testimony here today, that that was a shock to you?
>
> [Vega]. Yes, it was.

6

[Prosecutor]. And I'm assuming because of what your testimony is here today that you didn't sell heroin; you would have wanted to tell the detective that you didn't sell heroin?

[Vega]. Correct. But I also have the right to remain silent.

[Prosecutor]. But you didn't -- So you didn't make any effort to talk to the detective about the fact that you were innocent of these charges?

[Vega]. No.

[Prosecutor]. And you didn't take any opportunity after that point to contact Detective Schultz to explain Mr. Gershon's presence at your residence on those five occasions?

¶14 At this point, Vega's attorney objected, and a sidebar discussion was held between both counsel and the circuit court. Vega's attorney explained during the sidebar that he was objecting to the prosecutor's "continued questions about exercising the right to remain silent." The prosecutor responded that the questioning was not a comment on Vega's exercise of his right to remain silent. Instead, the prosecutor argued that the questioning was proper because "a defendant at any point in time once they invoke [the right to remain silent] can always take it back and choose to make comments." The circuit court agreed with the State's position and overruled the objection.

¶15 After the sidebar, the prosecutor continued this line of questioning:

[Prosecutor]. So, again, Mr. Vega, you have recounted for the jury here today your explanation of the five times when Mr. Gershon was at your residence and what those were for. I'm assuming you knew this same information back on June 28th when all of this happened and you were arrested.

[Vega]. On the 27th, you mean?

[Prosecutor]. Right.

[Vega]. Well, I don't know what he all meant when he said I had five control buys. I didn't know what that was for.

[Prosecutor]. That's not my question. My question is what you told us today I'm assuming you knew back on June 27th, correct?

[Vega]. Correct.

[Prosecutor]. All right. So if you knew it on June 27th -- I understand that day you chose not to talk with the officers, but even after that point you never made any effort to contact the police to talk about what happened from your point of view?

[Vega]. If I wouldn't have known what it's about, what am I going to talk about?

[Prosecutor]. You never made any attempt after June 28th to talk with law enforcement to share this information with them that you shared with the jury here today?

[Vega]. No.

[Prosecutor]. And I'm assuming you had the opportunity to do so. You just chose not to.

[Vega]. That's one of my rights.

¶16    The jury found Vega guilty of five counts of delivery of heroin and one count of maintaining a drug trafficking place.

## II. Postconviction Proceedings.

¶17    Vega filed a postconviction motion seeking a new trial on the ground that the circuit court erred in allowing the prosecutor to question him about his decision not to speak with the police after he had been arrested and read the

*Miranda* warnings.[3] The circuit court held a hearing and denied Vega's motion. The court concluded that the prosecutor's questions regarding Vega's post-arrest silence were proper because those questions were aimed at impeaching Vega's testimony that he did not know he was being arrested for the sale of heroin. The circuit court also reasoned that, even if the prosecutor's questions violated Vega's constitutional rights, the court would still deny Vega's motion because there was no reasonable possibility that those questions contributed to the jury's decision.

¶18 Vega appeals the judgment of conviction regarding the convictions for delivery of heroin and maintaining a drug trafficking place[4] and the circuit court order denying his postconviction motion.

¶19 We mention other material facts in the following discussion.

## DISCUSSION

¶20 We begin by addressing Vega's argument that the circuit court erred in permitting the prosecutor to question Vega regarding his exercise of his right to remain silent after his arrest.

---

[3] Vega also argued in his postconviction motion that, if the State would argue that Vega's trial counsel did not timely object to these questions, then his trial counsel provided constitutionally ineffective assistance by failing to timely object to the State's questioning on this subject. The State does not argue on appeal, and did not argue in the circuit court, that Vega's counsel failed to properly preserve an objection to the State's line of questioning. Accordingly, we do not consider Vega's contentions regarding ineffective assistance of counsel.

[4] Vega does not request a new trial on his convictions for bail jumping or possession of THC.

## I.  The Prosecutor's Questioning Regarding Vega's Exercise of His Constitutional Right.

### A.  Standard of Review and Governing Principles.

¶21    This appeal requires us to determine whether the prosecutor's questioning regarding Vega's exercise of his right to remain silent after his arrest and receipt of *Miranda* warnings violated Vega's due process rights under the Fourteenth Amendment to the United States Constitution.  *See State v. Brecht*, 143 Wis. 2d 297, 316, 421 N.W.2d 96 (1988) (citing *Doyle v. Ohio*, 426 U.S. 610 (1976)).  "The application of constitutional principles to undisputed facts presents a question of law, which we review de novo."  *State v. Cockrell*, 2007 WI App 217, ¶14, 306 Wis. 2d 52, 741 N.W.2d 267.

¶22    "It is well established that it is fundamentally unfair and a violation of a defendant's constitutional right to due process to use a defendant's silence after receipt of *Miranda* warnings for impeachment purposes at trial."  *Brecht*, 143 Wis. 2d at 316.[5]    The basis for this rule is twofold.  First, "because an arrestee's silence following *Miranda* warnings may be nothing more than his or her exercise of *Miranda* rights, post-*Miranda* silence is insolubly ambiguous."  *Id.* (citing *Doyle*, 426 U.S. at 617-18); *Reichhoff v. State*, 76 Wis. 2d 375, 382, 251 N.W.2d 470 (1977) (noting that in-custody silence is "so ambiguous that it is of little probative force" (citation omitted)).  "Second, and more important, it

---

[5]    "[I]n *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L.Ed. 2d 490 (1982), the Court held that [*Doyle v. Ohio*, 426 U.S. 610 (1976)] applied only where the person had been given *Miranda* warnings, not to post-arrest silence where no *Miranda* warnings had been given." *State v. Cockrell*, 2007 WI App 217, ¶15 n.4, 306 Wis. 2d 52, 741 N.W.2d 267; *see also State v. Brecht*, 143 Wis. 2d 297, 316, 421 N.W.2d 96 (1988).

would be fundamentally unfair to allow an arrestee's silence to be used to impeach an explanation subsequently offered at trial after he or she has been impliedly assured, by *Miranda* warnings, that silence will carry no penalty." *Brecht*, 143 Wis. 2d at 316 (citing *Doyle*, 426 U.S. at 617-18).

¶23 The facts of this case are very similar to the facts presented in *Doyle*. There, Doyle was arrested for selling marijuana to an informant during a controlled purchase and was read the *Miranda* warnings at the time of his arrest. *Doyle*, 426 U.S. at 611-12. At trial, Doyle testified that he had been framed by the informant. *Id.* at 612-13. On cross-examination, the prosecutor asked Doyle why he had remained silent after his arrest and had not informed the officers that he was allegedly framed by the informant. *Id.* at 614 n.5. His counsel's objections were overruled, and Doyle was convicted. *Id.* at 614. On appeal, the Supreme Court held that the prosecutor's use of Doyle's silence to impeach his exculpatory account violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 619. The Court provided further reasoning and stated:

> [W]hile it is true that the *Miranda* warnings contain no express assurance that the silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.…
>
> … "[I]t does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony."

*Doyle*, 426 U.S. at 618-19 (citations and footnote omitted).

11

## B. The Prosecutor's Questions Violated Vega's Due Process Rights.

¶24    The circuit court erred in allowing the prosecutor's questioning of Vega regarding his exercise of his right to remain silent after his arrest and receipt of **Miranda** warnings because the questions violated his due process rights under the Fourteenth Amendment.  To repeat, Vega was arrested, read the **Miranda** warnings, and charged with selling heroin to an informant.  Like the prosecutor in **Doyle**, the prosecutor here asked Vega during cross-examination why he made no effort to inform the officers of his version of events.  The State attempted to use Vega's exercise of his right to remain silent to draw an unfavorable inference as to the truth of Vega's trial testimony giving an exculpatory version of events, even though Vega had been "impliedly assured, by **Miranda** warnings, that silence will carry no penalty."  *See* **Brecht**, 143 Wis. 2d at 316 (citing **Doyle**, 426 U.S. at 617-18).  We follow the Supreme Court's reasoning in **Doyle**, and our supreme court's reasoning in **Brecht**, and conclude that the prosecutor's questioning and the circuit court's ruling constituted error that violated Vega's due process rights under the Fourteenth Amendment.[6]

## II.  Harmless Error.

¶25    The State contends that Vega is not entitled to a new trial because the improper questioning of Vega during cross-examination, and the circuit court's

---

[6] We note that the State does not expressly concede that the questioning of Vega, and the circuit court's ruling, violated Vega's constitutional rights.  Nonetheless, in briefing in this court, the State does not attempt to refute Vega's argument that there was error.  Therefore, even beyond the substantive analysis we have provided in the text, we further interpret the State to concede error.  **State v. Moore**, 2002 WI App 245, ¶13, 257 Wis. 2d 670, 653 N.W.2d 276 (holding that the State "tacitly admits error" when it fails to respond to the defendant's argument).

ruling, were harmless error. We begin our analysis of this issue by setting forth our standard of review and governing principles regarding harmless error.

### A. Standard of Review and Governing Principles.

¶26    Even if a court concludes that a prosecutor's questions regarding a defendant's post-arrest, post-*Miranda* exercise of the right to remain silent were allowed in error, the court need not grant a new trial if it concludes that the error is harmless. *Id.* at 317-18. In criminal cases, "[t]he defendant has the initial burden of proving an error occurred, after which the State must prove the error was harmless." *State v. Sherman*, 2008 WI App 57, ¶8, 310 Wis. 2d 248, 750 N.W.2d 500. Whether an error is harmless presents a question of law for our independent review. *State v. Beamon*, 2013 WI 47, ¶19, 347 Wis. 2d 559, 830 N.W.2d 681.[7]

¶27    Wisconsin's harmless error rule is codified in WIS. STAT. § 805.18 (2019-20)[8] and is made applicable to criminal proceedings by WIS. STAT. § 972.11(1). *Sherman*, 310 Wis. 2d 248, ¶8. Under this rule, "error is harmless if

---

[7] The State does not dispute Vega's contention that the remedy in these circumstances, if the error is not harmless, is vacation of the convictions for delivery of heroin and maintaining a drug trafficking place and a new trial on those counts.

[8] WISCONSIN STAT. § 805.18(2) states, in full:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

13

the beneficiary of the error proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Martin*, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270 (quoting *State v. Mayo*, 2007 WI 78, ¶47, 301 Wis. 2d 642, 734 N.W.2d 115). Stated otherwise, this court "must be satisfied, beyond a reasonable doubt, not that the jury *could* have convicted the defendant (*i.e.*, sufficient evidence existed to convict the defendant), but rather that the jury *would* have arrived at the same verdict had the error not occurred." *Martin*, 343 Wis. 2d 278, ¶45 (citations omitted).

¶28 Several non-exhaustive factors assist in our analysis of whether an error is harmless: (1) the frequency of the error; (2) the importance of the erroneously admitted evidence; (3) the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; (4) whether the erroneously admitted evidence duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case. *Id.*, ¶46.

### B. Harmless Error Factors.

¶29 We continue our analysis by next considering the relevant harmless error factors.[9]

---

[9] As noted, the list of harmless error factors set forth by our supreme court includes seven factors. *State v. Martin*, 2012 WI 96, ¶46, 343 Wis. 2d 278, 816 N.W.2d 270. However, we follow the lead of the parties and do not address the factors regarding "the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence" or "whether the erroneously admitted evidence duplicates untainted evidence" because those factors are not relevant in this context.

### 1. Frequency of the Error.

¶30 The first factor we consider in our harmless error analysis is the frequency of the error. *See id.* When analyzing this factor in the context of unconstitutional references to a defendant's exercise of the right to remain silent, our supreme court often looks to the following facts about the proceedings: the number of references made by the prosecution; the relative isolation or concentration of the individual references; and whether the prosecution made a reference during closing arguments. *See, e.g.*, ***Reichhoff***, 76 Wis. 2d at 381 (holding that the prosecutor's comments on a defendant's exercise of the right to remain silent were prejudicial partially because the prosecution asked two witnesses five different questions and commented "at some length" at two different points during closing arguments); ***Brecht***, 143 Wis. 2d at 317-18; ***State v. Sorenson***, 143 Wis. 2d 226, 263-64, 421 N.W.2d 77 (1988). Here, the State contends that the prosecutor "asked a few questions" on this topic and "moved on." We disagree.

¶31 The prosecutor asked the constitutionally prohibited questions on the final day of the three-day trial shortly before closing arguments. During this line of questioning, the prosecutor asked Vega six separate questions that directly addressed Vega's post-arrest, post-***Miranda*** exercise of his right to remain silent, and Vega answered each question. The prosecutor also asked several questions during that exchange regarding necessary background for the questions that directly violated Vega's due process rights. On the other hand, the prosecutor did not make any further reference to Vega's silence during closing arguments.

¶32 The frequency of the error under the first factor weighs slightly in favor of prejudicial error. In a concentrated line of six questions, combined with

other background-related questions, the prosecutor directly asked Vega why he chose to remain silent after his arrest. The State contends that this factor weighs in favor of harmless error because the prosecution did not return to the topic after this line of questioning. The State's discrete point that the prosecutor avoided the topic during closing arguments weighs modestly in favor of harmless error. Nonetheless, on balance and based on the number and concentration of the State's questions, along with the point in the trial during which the multiple questions occurred, we conclude that the first factor weighs slightly in favor of prejudicial error.

## 2. The Importance of the Erroneously Admitted Evidence and
## the Nature of the Defense.[10]

¶33    We next consider the factor of the importance of the erroneously admitted questions and answers regarding Vega's exercise of his right to remain silent. *See Martin*, 343 Wis. 2d 278, ¶46. When considering this factor, courts often emphasize the pertinence of the erroneously admitted evidence to the elements of the crimes charged and the importance of the evidence to the State's case. *Id.*, ¶¶48-52; *State v. Jorgensen*, 2008 WI 60, ¶47, 310 Wis. 2d 138, 754 N.W.2d 77. We also examine the importance of those questions within the framework of the nature of Vega's defense. *See Martin*, 343 Wis. 2d 278, ¶46.

¶34    Vega argues that the prosecutor's questions were not harmless because Vega's credibility was central to his defense. According to Vega, the

---

[10] For clarity, we analyze together the factors regarding the importance of the erroneously admitted evidence and the nature of the defense. We do the same later in this opinion regarding the factors concerning the strength and nature of the State's case.

jury's verdict "rested entirely" on evaluating Vega's credibility, which had been unconstitutionally impugned by the prosecutor's questions about Vega's exercise of his right to remain silent.

¶35    Vega testified at trial that he had not sold heroin to anyone, including Gershon.  During closing argument, Vega set forth his defense that Gershon was untrustworthy and had lied to the police by sneaking heroin past the officers' initial search and pocketing the recorded money that was meant to be given to Vega.  In support of his defense, Vega relied in part on the following undisputed facts:  Gershon was a heroin user at the time of these events; the amount of heroin produced by Gershon to the officers was about the size of a large kernel of corn; the police officers did not search under Gershon's clothes before Gershon met with Vega; the officers did not record or listen to the phone calls between Vega and Gershon that set up the meetings; the audio recordings of the transactions did not reference heroin;[11] the video recordings did not depict, nor did police observe, an exchange of money or heroin; the State did not present evidence that Vega's fingerprints or his DNA were found on the heroin packages; and no heroin or recorded money was recovered during the officers' search of Vega's vehicle and residence done a few days after the alleged final transaction of the five charged transactions which occurred over the course of ten days.

¶36    If the jury found Vega credible, then the jury would have believed that Vega did not deliver heroin to Gershon and would have found reasonable

---

[11] We repeat that the State does not quote from those audio recordings and, instead, relies on Gershon's recollections and his interpretations of the recordings.  The circuit court, without the jury present, stated that the audio recordings were "virtually unintelligible from my perspective, which is exactly the same perspective as this jury has."

doubt in the State's case and reached a different verdict. However, the State's constitutionally prohibited questions impugned Vega's credibility by purporting to give the jury a reason to believe that Vega had fabricated his version of events based on his exercise of a constitutional right. *Cf.* **Reichhoff**, 76 Wis. 2d at 381-82 (holding that erroneous references to the defendant's exercise of the right to remain silent "cast doubt on the defendant's credibility" because those references suggested that "the defendant must have had something to hide and was really guilty because he did not protest his innocence at arrest"); **Brecht**, 143 Wis. 2d at 318 (stating that references to a defendant's post-arrest, post-**Miranda** exercise of the right to remain silent "have a high potential for prejudice"). Indeed, the State now concedes the importance of the jury's assessment of the credibility of Vega and of Gershon by stating in briefing in this court: "Ultimately, the verdicts were the result of the jury weighing the relative credibility of Gershon's story and Vega's story."

¶37 Accordingly, these factors weigh strongly against the State's assertion of harmless error. We now consider, and reject, the State's arguments to the contrary.

¶38 The State argues that the questions about Vega's exercise of his right to remain silent were not "central" to its case because the prosecutor did not return to the topic after the questions were asked and answered. Although the State did not explicitly return to the topic in its closing arguments, the prosecutor's questions on cross-examination were more than "benign" comments. *See* **Jorgensen**, 310 Wis. 2d 138, ¶47 (evidence is not "benign" and harmless if it is "directly pertinent to the State's case"). The prosecutor asked a series of six separate questions directly addressing Vega's exercise of his right to remain silent that the prosecutor clearly wanted the jury to believe were highly relevant to the

State's case and Vega's defense. Helping to highlight the point was that, in response to these questions, Vega was forced into the position of twice asserting before the jury that he had a right to remain silent: "Correct. But I also have the right to remain silent." "That's one of my rights." This line of questioning by the prosecutor "[did] not occur in a brief moment" and was not "glossed over as seemingly irrelevant." *See id.*

¶39 The State also argues that there was harmless error because Vega's version of events is "simply beyond belief." The State argues that Vega's story "makes no sense" because the jury would have to believe that: Gershon was willing to risk trafficking heroin to the police in order to pay back Vega for the stolen goods and escape a theft charge; five times Gershon retrieved heroin concealed in his clothes while wearing a recording device; and Gershon did not use the heroin for himself or sell it to another person to pay back Vega. We disagree for several reasons. First, it is important to our analysis that it is the State that must establish, beyond a reasonable doubt, "that the jury would have arrived at the same verdict had the error not occurred." *Martin*, 343 Wis. 2d 278, ¶45 (citations and emphasis omitted). Second, Vega's exculpatory version of events is not wholly inconsistent with the facts of the case. Indeed, in its argument that Vega's story is "beyond belief," the State does not point to any facts that directly contradict Vega's version of events other than Gershon's testimony. Third, there are undisputed material facts that support Vega's exculpatory statements to the jury that we again summarize: the amount of heroin produced by Gershon to law enforcement was very small in size and the officers did not search under Gershon's clothes before Gershon met with Vega; the officers did not record or listen to phone calls between Vega and Gershon before the meetings; the audio recordings of the transactions were unintelligible and the State relied on Gershon's

recollection and interpretations of the recordings; there was no video recording of an exchange of money or heroin between Gershon and Vega, and the police did not observe such an exchange; the State did not present evidence that Vega's fingerprints or DNA were on the heroin packages; and no heroin or recorded money was recovered during the officers' search of Vega's vehicle and residence although the searches were done only a few days after the final alleged transaction and the transactions occurred over the course of ten days. Fourth, the State's main contention is that a jury would likely not believe that Gershon had sufficient motivation to frame Vega. Thus, the State's contention necessarily assumes that the strength of Vega's defense depended on the jury's consideration of Vega's credibility as compared to Gershon's. For those reasons, the State has not established its assertion made in this court that Vega's defense was beyond belief such that the prosecutor's constitutionally prohibited questions were harmless error.

¶40 The State further argues "the mere fact that an alleged error pertained to witness credibility does not mean that such an error cannot be harmless." The State cites as support our supreme court's decision in *State v. Hunt*, 2014 WI 102, 360 Wis. 2d 576, 851 N.W.2d 434. In that case, the circuit court erroneously excluded a witness's testimony that would have corroborated the defendant's theory of defense and lent credibility to the defendant's version of events. *Id.*, ¶25. Although the case "largely turn[ed] on credibility determinations," our supreme court stated that the exclusion of the witness's testimony was harmless error because another witness's testimony "functionally served the same purpose by corroborating [the defendant's] version of events." *Id.*, ¶¶28, 30. The State also cites as support this court's decision in *State v. Moore*, 2002 WI App 245, 257 Wis. 2d 670, 653 N.W.2d 276. There, the circuit

20

court erroneously admitted character evidence that improperly bolstered a witness's credibility. *Moore*, 257 Wis. 2d 670, ¶15. Although the defendant argued that the State's case hinged on the witness's credibility, this court stated that the circuit court's decision to admit the character evidence was harmless error because the defendant's theory of defense was "farfetched." *Id.*, ¶¶17-18.

¶41 We reject the State's reliance on those opinions for two reasons. First, the general principle relied on by the State that an error related to credibility has the potential to be harmless does not alter our conclusions already stated. Second, as we now describe, the reasoning in both *Hunt* and *Moore* is not of assistance to our analysis of the facts in this case. The State does not explain how the analysis in *Hunt* regarding the *exclusion* of testimony that was harmless because other evidence "functionally served the same purpose" is applicable to the analysis in this case concerning the testimony the jury heard that should have been excluded but was not. *Hunt*, 360 Wis. 2d 576, ¶30. In *Moore*, the erroneously admitted evidence was harmless error because the defendant's version of events which alleged that an informant framed Moore was, under any reasonable view of the evidence, completely implausible. *Moore*, 257 Wis. 2d 670, ¶¶17-18. This court came to that conclusion based on Moore's theory of defense that could not account for these undisputed facts, among others: A police officer saw Moore retrieve from a garage a bag that, a few moments later, the informant delivered to police with a one-pound brick of marijuana in it; police could hear Moore speaking to the informant through a transmitter given to the informant by police except during the time Moore left his house to go into his garage to retrieve the bag; a search of the same garage owned by Moore found Moore's car parked in that garage with marijuana particles in his car and on the hood of the car; and, through a separate transmission of a conversation between Moore and the

21

informant, police heard Moore state information about where he had placed marijuana and related materials, and those materials were found at that place when police executed a search warrant. *Id.*, ¶¶5-6, 9-10, 18. Unlike the "farfetched" assertions in *Moore*, and for the reasons already discussed, the State has not met its burden to show that the erroneously admitted questions in this case did not contribute to the jury's verdict. *See Martin*, 343 Wis. 2d 278, ¶45.

### 3. The Strength and Nature of the State's Case.

¶42 The final relevant factors that we consider are the strength and nature of the State's case. *See id.*, ¶46. The State argues that, even if the prosecutor had not explicitly addressed Vega's exercise of his right to remain silent, the jury still would have convicted Vega because the State had a strong case against Vega. We now summarize the evidence and argument presented by the State.

¶43 Elaborating on our summaries of the trial evidence above, the State presented testimony from two law enforcement officers who were involved in arranging the meetings between Vega and Gershon. The State also presented testimony from Gershon that Vega had sold Gershon heroin in exchange for the pre-recorded "buy" money. After Vega presented his case to the jury, the prosecution called Gershon to the stand on rebuttal, and he denied many of the events that Vega described during his testimony. During closing argument, the prosecutor emphasized that the jury must assess the credibility of Gershon and Vega. The prosecutor argued that the jury should not believe Vega's version of events because the evidence established that Gershon's version of events was credible and Vega's version was not.

22

¶44     The factor regarding the strength of the State's case weighs in favor of a conclusion of harmless error. Gershon's testimony, which was in respects corroborated by other testimony and physical evidence, if believed by the jury, indicates that Vega sold heroin to Gershon on each of the five occasions.

¶45     Nonetheless, the other factor—the nature of the State's case—weighs in favor of the conclusion that the error was not harmless. To prove its case beyond a reasonable doubt, the State was required to convince the jury that Vega's exculpatory version of events was wrong. As explained in detail earlier, the jury's determination of the truthfulness of Vega's version of events depended in large part on whether the jury found Vega to be credible. It then follows that the prosecutor directly impugning Vega's credibility by violating Vega's due process rights was a material aspect of the State's burden to prove the elements of the crimes beyond a reasonable doubt. Therefore, we conclude that the nature of the State's case weighs against a conclusion of harmless error.

## C. There Was No Harmless Error.

¶46     Based on our review of the relevant harmless error factors, and for the reasons we now summarize, we conclude that the State has failed to fulfill its burden to prove beyond a reasonable doubt that the jury would have found Vega guilty absent the erroneously admitted questions. *See id.*, ¶¶45-46. The error was at least slightly in the "frequent" category because the prosecutor asked six questions in a concentrated line of questioning that violated Vega's constitutional right to due process.

¶47     Further, the erroneously admitted questions were highly relevant to the nature of Vega's defense that he had never sold heroin to Gershon. Vega wanted the jury to find him credible and believe his version of events over the

State's version of events. However, the prosecutor's questions regarding his exercise of his right to remain silent after arrest undermined in the jury's eyes the truthfulness of Vega's version of events by suggesting that Vega was not a credible source of information. Thus, the jury's decision regarding Vega's defense was affected by the prosecutor's questions.

¶48 Similarly, the constitutionally prohibited questions were relevant and important to the nature of the State's case. It was important for the State to discredit Vega's theory of defense in order to prove its case beyond a reasonable doubt. If the jury had found that Vega was a credible source of information, then the jury could have reasonably believed his exculpatory version of events and found that the State had not proved its case beyond a reasonable doubt. As a result, the prosecutor's questions helped sway the jury in favor of the State's version of events.

¶49 Therefore, Vega is entitled to a new trial on the charges of delivery of heroin and maintaining a drug trafficking place because the prosecutor's questions regarding Vega's exercise of his right to remain silent after his arrest and receipt of *Miranda* warnings violated Vega's due process rights, and the State's constitutionally prohibited questions and the circuit court's ruling do not constitute harmless error.

## CONCLUSION

¶50 For the foregoing reasons, the judgment of conviction is reversed regarding the convictions for delivery of heroin and maintaining a drug trafficking place, the order of the circuit court is reversed, and this matter is remanded for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded with directions.

Not recommended for publication in the official reports.