COURT OF APPEALS
DECISION
DATED AND FILED

February 22, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1138**

Cir. Ct. No. **2021ME311**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE CONDITION OF J.D.J.:

WINNEBAGO COUNTY,

PETITIONER-RESPONDENT,

V.

J.D.J.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: SCOTT C. WOLDT, Judge. *Affirmed*.

¶1    LAZAR, J.[1]  J.D.J.[2] appeals from orders of the trial court, entered pursuant to WIS. STAT. § 51.20, for his civil commitment and for involuntary medication and treatment.  J.D.J. asserts that he received an unfair trial because the trial court did not uphold a pretrial ruling in several respects.  In particular he asserts that, over the objection of J.D.J.'s trial counsel, experts were permitted to reference hearsay, witnesses were not properly excluded from the courtroom, and the jury was allowed to hear prejudicial and irrelevant testimony including details of J.D.J.'s prior convictions.  This court disagrees and affirms.

## BACKGROUND

¶2    J.D.J. is serving a prison sentence at the Wisconsin Resource Center (WRC), a psychiatric facility that treats Department of Corrections inmates.  On July 22, 2021, Dr. George Monese, staff psychiatrist at the WRC, on behalf of Winnebago County, filed a formal petition for J.D.J.'s civil commitment and involuntary medication and treatment pursuant to WIS. STAT. § 51.20.  The circuit court[3] found probable cause and appointed two doctors—Dr. Marshall Bales, a psychiatrist and physician, and Dr. Kevin Miller, a psychologist—to examine J.D.J. and prepare written reports on his condition.

¶3    Before the jury trial on this petition, J.D.J. filed a motion in limine seeking, among other things, an order prohibiting the County from mentioning

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2]  This court refers to Appellant by his initials to protect his confidentiality.

[3]  The Honorable Daniel J. Bissett presided over a de novo probable cause hearing on August 5, 2021.

J.D.J.'s criminal convictions, excluding witnesses from the courtroom before they testified, and prohibiting experts from offering hearsay testimony or expert opinion regarding recent dangerousness. The County did not object to those particular requests; it did object to others and sought permission to ask J.D.J. whether he had been convicted of a crime (and the number of convictions) for impeachment purposes and to offer expert testimony on statements written or heard so long as they were being offered for medical diagnosis or treatment as permitted by WIS. STAT. § 908.03(4). Rather than addressing each of the issues in J.D.J.'s motion, the trial court[4] asked counsel at the start of the jury trial if they had anything to address. J.D.J.'s attorney argued that prior convictions should not be used for any reason. The court sided with the County, saying, "the fact that someone has been convicted at one point has nothing to do with their status now so I am going to overrule the objection. I'll allow [questions about convictions] to come in."

¶4     Outside the presence of the jury, the County called Bales to testify regarding its request for involuntary medication. Bales testified that J.D.J. "was psychotic, he was manic" and not "reality based" during his examination, concluding that J.D.J. was not competent to refuse medication that would treat his mental illness. Then, in the presence of the jury, Bales testified about J.D.J.'s schizoaffective disorder and his opinion that J.D.J. was a danger to others because he caused them to fear for their safety. Bales acknowledged that the "Plexiglass wall" between them and J.D.J.'s handcuffs eased his own fear during his examination of J.D.J., but discussed threats of sexual assault J.D.J. had made to staff and his threats of harm to "other inmates." The court overruled J.D.J.'s

---

[4] The Honorable Scott C. Woldt presided over the jury trial on September 14, 2021.

3

objection to "hearsay being used as a factual basis for dangerousness," but J.D.J. did not object to the County's mention of handcuffs, other inmates, or other indicia of J.D.J.'s status as a prisoner. Bales also testified that the records reflected an incident in which J.D.J. spit at someone as well as "extremely violent threatening behavior day after day" toward "everyone in [J.D.J.'s] surroundings."

¶5 After Bales testified, the trial court held a sidebar during which it appears that J.D.J.'s counsel objected that two County witnesses were present in the courtroom during Bales's testimony contrary to the pretrial motion in limine ruling. Unfortunately, that sidebar was not recorded. It appears that the two witnesses left the courtroom at that time.

¶6 Miller testified next and opined that J.D.J. was suffering from mental illness and that he was at "a significant risk of doing harm to others." His opinion was based on reports of alleged threats made and assaults committed by J.D.J. against others at WRC as well as on J.D.J.'s threats toward him during the evaluation.

¶7 Next, the County called two psychiatric care technicians (PCTs) who had worked with J.D.J. at WRC (and who had been in the courtroom when Bales testified). J.D.J.'s counsel again attempted to raise the issue of their violation of the pretrial ruling with the court outside the presence of the jury before the first PCT testified, but the court stated, "[w]e will [address the issue] after. I know what your arguments are and I know what my findings would be." Both PCTs testified about interactions they had with J.D.J., including the incident Bales had mentioned during which J.D.J. allegedly spat (or attempted to spit) at one PCT over concerns that pepperoni had pork (and was not acceptable under J.D.J.'s

religion), threats J.D.J. made against various staff members, and another incident in which J.D.J. threw warm soup at a staff member.

¶8 Again outside the presence of the jury, the trial court addressed J.D.J.'s objections to testimony from the County's witnesses at the conclusion of the County's case. It stated that it permitted the testimony of the PCTs because their presence in the courtroom during Bales's testimony was not prejudicial to J.D.J.; in essence, the court concluded that the PCTs "talked about different issues" than Bales. Moreover, the court said, J.D.J.'s counsel could have seen these witnesses earlier and brought up the issue; the court addressed it (by having the PCTs leave prior to Miller's testimony) as soon as it was brought to its attention. The court also overruled J.D.J.'s request to have Bales's testimony excluded for referencing J.D.J.'s criminal history and comparing the WRC to a "supermax," reasoning that Bales "is just describing what it is like being there and it is a situation where [J.D.J.]'s being supervised closely."

¶9 Finally, J.D.J. testified on his own behalf. He denied threatening anyone, responding to a question about the comments others were characterizing as threats as follows:

> They are just jokes. Well, sometimes I get mad and I say -- you know, we all get mad and say things we don't mean, but even if I said it, when I come out of my cell they bring me out of my cell the next day, and I'm not attacking them so how am I dangerous.

J.D.J. could not recall attempting to spit on anyone or throwing soup on anyone. He admitted that he had a tendency to "talk aggressive." In addition to many references to his "cell," some of which appear above, J.D.J. (or his counsel) mentioned other aspects of WRC that could suggest his incarcerated status: "the hole," jail, handcuffs, and other "inmates" at WRC. On cross-examination, the

County asked J.D.J. whether he had ever been convicted of a crime. When J.D.J. admitted that he had but couldn't remember how many times, the County asked specifically about each of J.D.J.'s six prior convictions. In summarizing J.D.J.'s case during closing argument, J.D.J.'s counsel described J.D.J.'s living situation at WRC (as he did in his opening statement) as one in which J.D.J. "cannot leave," has very few "liberties," and "is every day at this facility, every day is supervised."

¶10     Ultimately, the jury found that J.D.J. was mentally ill, dangerous, and a proper subject for treatment. After the jury was released, the trial court issued an order for a six-month[5] civil commitment and a corresponding order for involuntary medication and treatment during that same time period. J.D.J. appeals.

## DISCUSSION

¶11     J.D.J. contends that he was deprived of a fair trial and that the trial court refused to hold the County responsible for various violations of a pretrial order. He further contends the jury was allowed to hear prejudicial and irrelevant testimony, allegedly to his detriment. The County asserts there was no pretrial

---

[5] The six-month commitment was to expire in March, 2022. Prior to that date, the County filed a formal petition to extend J.D.J.'s commitment, and a hearing was held on that petition on February 24, 2022, at which time the circuit court (the Honorable Barbara H. Key) ordered J.D.J. recommitted for twelve months. J.D.J.'s appeal of that recommitment was fast-tracked and this court (in a one-judge decision on November 23, 2022) affirmed the recommitment. *Winnebago County v. J.D.J.*, No. 2022AP1357-FT, unpublished slip op. (WI App Nov. 23, 2022). That opinion does not render this appeal moot at least for the reason that J.D.J. is still subject to the collateral consequence of the firearms ban as a result of his initial commitment. *See Marathon County v. D.K.*, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901 (holding that, despite the fact that subject individual's initial commitment was expired, the commitment was not a moot issue because it still subjected him to the collateral consequence of a firearms ban, which would be voided in the event of a decision in his favor on appeal).

order and, regardless, the court properly exercised its discretion regarding exclusion of witnesses, potential hearsay, and questioning J.D.J. about his prior convictions. Any errors, says the County, were harmless. Except for the issuance of the pretrial order, this court agrees with the County.

### I.       General legal principles and standards of review.

¶12     It is correct that individuals—all individuals—are entitled to fair trials where their liberty interests are properly protected. This is particularly true in civil commitment cases that may uniquely deprive citizens of their personal liberty (with supervised commitment in the community or an inpatient stay in a mental health facility or the WRC) and may also restrict their rights by curtailing their ability to select or refuse certain medications and treatment. Both aspects are significant restrictions of personal liberty and must be reasonable and able to withstand constitutional scrutiny. "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" *Jones v. United States*, 463 U.S. 354, 361 (1983) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)).

¶13     To issue a civil commitment order, a trial court must find that a petitioner established, by clear and convincing evidence, that the subject individual is mentally ill, a proper subject for treatment, and dangerous to him/herself or others under at least one of five statutory standards. *Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; Wis. Stat. § 51.20(1)(a)1.-2., (13)(e). This is especially critical because "[i]t may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction." *Addington*, 441 U.S. at 428. Involuntary medication orders may only be issued, under the same clear and convincing burden of proof, with expert opinion that an individual is incompetent to refuse medication. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶37, 349 Wis. 2d 148, 833 N.W.2d 607; Wis.

STAT. §§ 971.17(3)(b) and 971.16(3). So, courts are to take special care in this area of law.

¶14    Pursuant to WIS. STAT. § 51.20(1)(a)2.b., the relevant standard at issue for J.D.J., an individual is dangerous when he

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

The statute clearly references "recent" behavior, acts, attempts, or threats.

¶15    The review of a civil commitment order and an order for involuntary medication and treatment—determining whether the petitioner has met the burden of proof—both present a mixed question of law and fact. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783; *Melanie L.*, 349 Wis. 2d 148, ¶¶37-39. Findings of fact are upheld unless they are clearly erroneous, *J.W.J.*, 375 Wis. 2d 542, ¶15, *Melanie L.*, 349 Wis. 2d 148, ¶38, and an appellate court will "accept reasonable inferences from the facts." *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

¶16    Finally, the decisions of the trial court to admit certain evidence, some alleged to be hearsay, are reviewed by this court under the erroneous exercise of discretion standard. *See Morden v. Continental AG*, 2000 WI 51, ¶81, 235 Wis. 2d 325, 611 N.W.2d 659. That standard is succinctly set forth in *Kenosha Hospital & Medical Center v. Garcia*, 2004 WI 105, ¶15 , 274 Wis. 2d 338, 683 N.W.2d 425, *clarified* 2004 WI 137, 276 Wis. 2d 359, 688 N.W.2d 462 as follows:

> This court has often said that "a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purposes of achieving a reasonable determination." An appellate court will affirm a [trial] court's discretionary decision as long as the [trial] court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." Therefore, the record on appeal must "reflect the [trial] court's reasoned application of the appropriate legal standard to the relevant facts in the case." "If a judge bases the exercise of his discretion upon an error of law, his conduct is beyond the limits of discretion."

(citations omitted); *see also Associated Bank N.A. v. Collier*, 2014 WI 62, ¶22, 355 Wis. 2d 343, 852 N.W.2d 443; *J.L. Phillips & Assocs., Inc. v. E & H Plastic Corp.*, 217 Wis. 2d 348, 364-65, 577 N.W.2d 13 (1998).

## II.    There was a pretrial ruling by the trial court.

¶17    After probable cause was found at the de novo hearing, J.D.J. demanded a jury trial and filed a "Motion in Limine" that actually consisted of twelve different motions for orders on twelve different (mostly evidentiary) issues. The County responded, stating that it had no objection to seven of the twelve motions and putting its own position on the remaining five motions before the trial court. The court started the jury trial by acknowledging that the motion and a response had been filed. J.D.J.'s counsel asked to address two of the County's responses but only actually raised concerns over the first motion, which sought to exclude references to J.D.J.'s prior criminal convictions.

¶18    The trial court, somewhat confusingly, said that it would "overrule the objection" and "allow it to come in." After the County sought clarification, the court ruled that the following questions about convictions were permissible: "Have you ever been convicted of a crime? How many times?" Thus, the court

denied J.D.J.'s first motion in limine. After hearing that both counsel had no other concerns and that J.D.J.'s counsel "agree[ed] with the responses for the remainder items," the court ruled "All right," implicitly granting the motions in limine to which the County had stipulated (motions 2-5, 7-8, and 12), and denying the remaining motions (6, 9, 10-11). The view that a pretrial ruling on the motions in limine was made is further bolstered by the fact that, towards the end of the jury trial, the court referenced "the pretrial motion that the County agreed to that said witnesses would be sequestered." That was a reference to J.D.J.'s seventh motion in limine to which the County had not objected; it was not a motion that the trial court addressed in oral argument. But, it clearly was one that the trial court had granted (by stipulation if not by actual order) for the jury trial.

¶19    Accordingly, this court concludes there was a pretrial ruling on all of J.D.J.'s motions in limine, and the parties were both bound[6] by the trial court's ruling and/or by their stipulations. It is with that understanding that this court reviews the matters at issue in this appeal.

### III.    The admission of hearsay testimony regarding dangerousness, if any, does not warrant reversal.

¶20    J.D.J. contends that the trial court erred when, over his objections, it allowed the two doctors to testify with hearsay regarding J.D.J.'s recent conduct reflected in their reports that was either prejudicial (because it went to dangerousness) or was irrelevant and stigmatized J.D.J. in the eyes of the jury.

---

[6] This court need not address whether the County had forfeited its right to challenge that the trial court had issued a pretrial ruling on all requests made in J.D.J.'s motion in limine or that the County had stipulated to portions thereof. *See Miesen v. DOT*, 226 Wis. 2d 298, 309, 594 N.W.2d 821 (Ct. App. 1999) (court of appeals "should decide cases on the narrowest possible grounds"); *Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (court of appeals need not address all issues raised by the parties if one is dispositive).

The County had asked in its response to J.D.J.'s tenth and eleventh motions in limine that "the physicians be permitted to testify to statements, written or heard, so long as they're being offered for medical diagnosis or treatment purposes, pursuant to [WIS. STAT. § 908.03(4)]." J.D.J.'s counsel "agree[ed] with the [County's] responses for the remainder [of the motion in limine] items." That narrows the topics upon which J.D.J. could object during trial or in this appeal.

¶21 First, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). The rules of evidence, including those on hearsay, apply to Chapter 51 trials. WIS. STAT. § 51.20(10)(c). J.D.J. asserts that the trial court erroneously exercised its discretion when it overruled his hearsay objection. He relies primarily on *S.Y. v. Eau Claire County*, 156 Wis. 2d 317, 457 N.W. 326 (Ct. App. 1990), *aff'd,* 162 Wis. 2d 320, 469 N.W.2d 836 (1991), in which this court stated, "[w]hile experts may rely on inadmissible evidence in forming opinions, [WIS. STAT. § 907.03], the underlying evidence is still inadmissible." *S.Y.*, 156 Wis. 2d at 327.

¶22 In response, the County relies upon the stipulation that the doctors were allowed to provide opinions and testify as to J.D.J.'s statements to others for purposes of treatment or diagnosis. It further asserts that statements made by J.D.J. were not even hearsay as they are admissions by a party opponent under WIS. STAT. § 908.01(4)(b). Moreover, it asserts that some of the testimony by the doctors was elicited during cross-examination when J.D.J.'s counsel tried to minimize the threats made to staff, thereby opening the door to the testimony. It also asserts that Miller testified, in part, about a threat J.D.J. specifically made to

him[7] during the examination: clearly that was not hearsay. This court agrees that those statements, at least, were properly admitted.

¶23 Finally, the County argues that if any hearsay evidence was admitted in error, it was harmless error and, pursuant to WIS. STAT. § 51.20(10)(c), it should be disregarded because it "does not affect the substantial rights of either party." J.D.J. counters that "harmless error" analysis is not appropriate when considering hearsay. That is inaccurate. This court addressed inadmissible hearsay in expert reports a la *S.Y.* in *State v. Weber*, 174 Wis. 2d 98, 109, 496 N.W.2d 762 (Ct. App. 1993), and concluded that appellate courts "are not to order a new trial for the improper admission of evidence unless an examination of the entire proceeding leads us to conclude that the error affected the substantial rights of the party seeking relief on appeal." The *Weber* court further elaborated that "[t]o determine whether the 'substantial rights' of a party have been affected, [this court is to] use the harmless error test" and that an "error is harmless and does not justify reversal if we can be sure that the error did not contribute to the guilty verdict." *Id.* This is applicable in the case of a civil commitment jury trial.

¶24 To begin, Miller's recounting of the threat J.D.J. made to him,[8] the testimony of PCTs Scott Cooke and Zach Zuhse as to conduct they observed, and

---

[7] J.D.J. told Dr. Miller "something to the effect of you're lucky you're on the other side of that glass" and Miller "took that to mean a direct threat to [his] safety." Miller further explained that:

> Even though there is a plastic partition, there is an opening and the desk as if I am sitting now, the opening is perhaps at arm's length so I pulled all my stuff back from the opening and then slid my chair back at that point because I have seen people get yanked through the traps in the past.

J.D.J.'s corroborating statements during his examination are not hearsay. That evidence was admissible. So, the only issue on appeal lies with the statements Bales and Miller made about the conduct and threats of J.D.J. observed by others that were contained in their reports—and only to the extent that testimony related to dangerousness as opposed to their diagnoses.

¶25 When Bales was asked to give an example of J.D.J. scaring people or putting people in fear, he described a female guard's report that J.D.J. threatened to sexually assault her. J.D.J.'s immediate hearsay objection was summarily overruled. But, in the same line of examination questions, Bales indicated that he asked J.D.J. about the threats and that J.D.J. "confirmed some of them." J.D.J. also told Bales that he was going to act on his threats and that "when [he] get[s] to general population or a less secure setting [he's] going to, so to speak, get even." To the extent Bales's testimony was based on J.D.J.'s confirmation of threats such as the one to the female guard, it is not hearsay; like Miller's testimony about the threat J.D.J. made to him, it concerns J.D.J.'s out of court statements but is not offered for the truth of whether he actually intended to assault the threatened person, only whether or not he made the threats.

¶26 Bales also discussed the alleged spitting incident, a threat to kill psychiatrist Monese, and threats to harm staff and other "inmates" that were

---

[8] J.D.J. appropriately conceded in his motion in limine that "[i]f any expert also has personal knowledge of any alleged facts that the County may wish to offer for dangerousness, that is a different issue than [J.D.J.] presents here."

reported to him.[9] J.D.J.'s counsel did not object to that testimony.[9] On cross-examination, his counsel delved further into the details of the spitting incident and inquired whether it was related to J.D.J.'s religion; Bales did not agree with that correlation. J.D.J.'s counsel also solicited additional salacious details about the threat to the female guard, implying that it was a request for consensual sex. He did the same when cross-examining Miller, seeking specific details about the spitting incident that Miller had testified about based on the "printed routine staff records" he reviewed. Without the cross-examination, none of these details would have been heard by the jury. J.D.J. cannot complain about questions asked by his own counsel.

¶27 Given that this court must examine "the entire proceeding" to determine whether any possibly improper admission of evidence affected J.D.J.'s substantial rights, the testimony of PCTs Cooke and Zuhse is relevant. *See Weber*, 174 Wis. 2d at 109. They testified about several of the incidents described by Bales and Miller that they had personally observed. Cooke, who was personally involved in the spitting incident, stated that he feared for his safety when J.D.J. attempted to spit at him. Zuhse said he feared the same when J.D.J. threatened to "beat [his] ass" and he took seriously threats to other staff that he heard J.D.J. make from his cell. Zuhse also saw J.D.J. throw warm soup at another member of the staff after stating, "you think I'm not a killer, all right then …." Finally, Zuhse testified that when he asked J.D.J. why he assaulted staff, J.D.J. replied:

---

[9] Typically, a "failure to object constitutes a forfeiture of the right on appellate review." *State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612. This rule "enable[s] the [trial] court to avoid or correct any error as it comes up, with minimal disruption of the judicial process and maximum efficiency." *State v. Counihan*, 2020 WI 12, ¶26, 390 Wis. 2d 172, 938 N.W.2d 530. This forfeiture rule "encourages timely objections and obviates the need for appeal." *Id.* In this case, this court will review the statements regardless.

> [O]nce I get to GP [General Population] I'll show you a
> real assault and the next time you go to court you can tell
> the Judge I'm going to kill you and Dr. Monese.

¶28 The trial court did not explain the basis for its decision to allow the testimony of Bales and Miller to remain in the record, but that is not surprising given the heat and fast pace of a jury trial. It is not uncommon for a court to give short, non-explanatory rulings in front of a jury; in fact, it is preferred. That failure to elaborate its rationale is not necessarily fatal to the decision because "if a [trial] court does not explicitly engage in balancing on the record, an appellate court can nevertheless affirm, if the record indicates that balancing is implicit from the [trial] court's determination." *State v. Gary M.B.*, 2004 WI 33, ¶26, 270 Wis. 2d 62, 676 N.W.2d 475; *State v. Pharr*, 115 Wis. 2d 334, 347, 340 N.W.2d 498 (1983). This court is to review the record to ascertain reasons to uphold discretionary decisions by the trial court. *State v. Hunt*, 2003 WI 81, ¶52, 263 Wis. 2d 1, 666 N.W.2d 771, *reconsideration granted*, 2003 WI 140, 266 Wis. 2d 68, 671 N.W.2d 853; *Sukala v. Heritage Mut. Ins. Co.*, 2005 WI 83, ¶8, 282 Wis. 2d 46, 698 N.W.2d 610. "We cannot search the record to find reasons to overturn [a court's] discretionary decisions." *State v. X.S.*, 2022 WI 49, ¶53, 402 Wis. 2d 481, 976 N.W.2d 425. The record indicates that the majority of the incidents or threats described by the two doctors were corroborated by the admissible testimony of the two PCTs who had personal knowledge of them, if not by J.D.J. himself. Thus, *S.Y.* is clearly distinguishable for those parts of the doctors' testimony, and the trial court had a reasonable rationale for not striking that testimony.

¶29 Even if the remaining testimony that was not corroborated was, in fact, inadmissible, reversal is still not warranted because it was harmless error by the trial court that did not affect J.D.J.'s substantial rights. *See Martindale v.*

*Ripp*, 2001 WI 113, ¶30, 246 Wis. 2d 67, 629 N.W.2d 698. Any inadmissible testimony did not reasonably contribute to the outcome of the proceedings, *see id.*, ¶32, because the remainder of the record very strongly supports the verdict on dangerousness. There was significant admissible testimony as to threats by J.D.J. that caused Miller, Cooke, and Zuhse to fear for their personal safety. The admission of the potential hearsay does not undermine this court's confidence in the outcome of the jury trial as to dangerousness because they were "strongly supported by evidence untainted by error." *See id.*

¶30    Given the volume of untainted evidence showing that J.D.J. was dangerous and the limited amount of hearsay, the potentially erroneous admission of that hearsay testimony by the trial court was harmless error and does not provide a sufficient basis upon which to reverse the jury's verdict. *See State v. Moore*, 2002 WI App 245, ¶16, 257 Wis. 2d 670, 653 N.W.2d 276.

## IV.    J.D.J.'s prior convictions were properly used as impeachment.

¶31    J.D.J. raises two concerns about his prior convictions. First, he contends that while the trial court only allowed the two standard questions (have you been convicted in the past, and how many times) the County went case-by-case and described each offense. He further contends that Miller, on his own, raised J.D.J.'s prior "conviction for throwing or expelling bodily fluids on people in the past" in his testimony. The trial court overruled J.D.J.'s motion to strike Miller's statement. J.D.J. complains that the lack of further explanation for the court's ruling necessitates reversal.

¶32    J.D.J. fails to acknowledge that the trial court's limitation to two questions about his prior convictions only applied if he correctly answered the questions. He did not. He admitted he had previously been convicted of a crime,

but he then said he did not "keep count" of the convictions and was not able to state how many times he had been convicted. Pursuant to WIS. STAT. § 906.09(1) and the court's pretrial ruling, that nonanswer allowed the County to delve more deeply into the convictions. That was proper impeachment and not a basis for reversal. *See Nicholas v. State*, 49 Wis. 2d 683, 689, 183 N.W.2d 11 (1971).

¶33    The prior conviction mentioned in Miller's statement was properly explored in J.D.J.'s impeachment testimony. Therefore, even though it was arguably inappropriate—and could potentially have been struck from the record— the trial court's decision to allow it to remain is harmless error. Miller apparently mentioned the prior conviction because he was confused by the questions asked by J.D.J.'s counsel. He stopped his testimony once the objection was made and he did not elaborate any further. It, like the other hearsay testimony, did not substantially affect the outcome of the trial.

### V.    The other alleged violations of the pretrial ruling were, likewise, harmless.

¶34    J.D.J. also argues that the County violated several uncontested portions of his motion in limine. These include the following:

3.    <u>Inmate status</u>: That the Respondent [J.D.J.] not be referred to as an inmate or prisoner. That the Respondent may be referred to as a patient.

4.    <u>Prison setting</u>: That the Wisconsin Resource Center not be referred to as a prison. That Wisconsin Resource Center may be referred to as a facility.

\*\*\*\*

7.    <u>Sequestration of witnesses</u>: That all witnesses be excluded from the courtroom and be admonished not to discuss their proposed testimony with any other witnesses.

¶35    Each is addressed below.    None of the arguments or purported violations rise to the level of warranting a new trial or otherwise provide a basis upon which to reverse the discretionary decisions of the trial court.

### A. Bales's references to WRC, prison, inmates, and more were harmless and were also routinely made by J.D.J. and his counsel.

¶36    J.D.J. contends that the County's "expert witness routinely violated the pre-trial ruling to exclude testimony that referred to WRC as a prison [and] referred to [J.D.J.]'s status as an inmate or prisoner."  J.D.J. did move to strike Bales's entire testimony "for repeat violations of the motion in limine discussing correctional officers, [J.D.J.'s] criminal history, as well as being placed in a supermax."  The trial court overruled the objection, stating that Bales was "just describing what it is like being there and it is a situation where he's being supervised closely so I'll deny the request -- overruled."  J.D.J. asserts that the court did not make "a reasonable conclusion" because Bales "made several prejudicial statements that did more than just describe his experience at WRC."  This court disagrees.

¶37    Contrary to J.D.J.'s assertions that Bales called WRC a prison, Bales actually started his testimony by stating that he met with J.D.J. at WRC "where he is a patient."  This was clear, nonprejudicial, and carried no "prison stigma."  The other references by Bales to which J.D.J. points likewise do not imply prison versus a highly secured mental institution:  (1) mention of a "security person"; (2) a comment that J.D.J. was behind "a Plexiglass wall and he was in handcuffs"; (3) reference to staff as guards and correctional officers; (4) characterizations of J.D.J.'s peers as "inmates;" and (5) a comment that J.D.J. was "kept on a high

security unit." In addition, J.D.J. complains that Bales said his unit was "almost a supermax."

¶38 Simply saying that WRC has security similar to a "supermax" is not the equivalent of saying it *is* a supermax *prison* or that J.D.J. is a prisoner. The trial court aptly noted that Bales was describing the level of security and not saying or even implying that WRC was a prison. This discretionary decision is not clearly erroneous—especially given the numerous references (or perhaps more apt, slips of the tongue) made by J.D.J. and his counsel, as noted below.

¶39 Nor do the other terms—except, arguably, "correctional officers"—necessarily imply a prison setting. Mental institutions may have security or other guards, may use restraints or handcuffs on unruly patients, may have high- and low-security units, and may call patients inmates. True the reference to correctional officers is not the best turn of phrase, but when taken into consideration with all the references made and terms used by J.D.J.'s counsel and J.D.J. himself, it pales in comparison.

¶40 J.D.J.'s counsel routinely made references that could imply a prison setting as opposed to a mental institution. First, in his opening statement, he painted a grim picture—grimmer than that described by the County or its witnesses:

> Every day [J.D.J.] resides at a facility that he cannot leave. Every day [J.D.J.] is supervised around the clock. Every day simple decisions like what to wear, what to watch on TV and what to eat are made by others, but today the government wants to take even more of his liberties away. The government wants to force an involuntary mental commitment on [J.D.J.] that he does not want.

¶41   In addition, J.D.J.'s counsel asked witnesses about "asking the staff member to come to [J.D.J.]'s cell" or "cell door;" "other times he has assaulted staff or other inmates;" whether he would "feel comfortable meeting up with [J.D.J.] on the jail -- excuse me, the WRC grounds?;" and, in questioning J.D.J., whether he has "attacked or attempted to attack any inmates or any patients or staff since June?"

¶42   In his own testimony, J.D.J. as well made five references to his "cell," denied that he had "any intention to attack any inmate," and said that "in the hole we come out once a day or depending on what level you are on. If you are on a high level, you come out twice a day."

¶43   In fact, the closest reference to WRC as a prison was when J.D.J.'s counsel apparently slipped and called it a jail. In response to the only objection to these types of statements, the trial court concluded that the supermax characterization did not unfairly stigmatize J.D.J. in the eyes of the jury. The court apparently concluded that there was no intentional violation of its order. This court agrees. The references to inmates and guards by the County's witnesses were not prejudicial, especially in view of J.D.J.'s own references to indicia of imprisonment, and does not appear to have been intentional. The court's discretionary decision to deny the motion to strike testimony was supported by the record and, thus, was not clearly erroneous.

## B. The failure to exclude[10] witnesses from the courtroom was not prejudicial.

¶44     There is no question that the County's witnesses were to be excluded from and not present in the courtroom until after they testified.  There is also no question that PCTs Cooke and Zuhse were present for at least part of Bales's testimony.  After this issue was brought to its attention, the trial court immediately ordered the two PCTs to leave the courtroom until they were called to testify.  J.D.J. contends that the trial court made two errors with respect to this situation: (1) it allowed the PCTs to testify without immediately addressing his objection; and (2) it refused to strike the PCTs' testimony "after determining that the violation was not prejudicial and it was trial counsel's fault."  The County asserts that Bales (the only witness the two PCTs could have heard testify) was not asked on direct examination detailed questions on the spitting incident; it was J.D.J.'s counsel who delved more into the facts, to his possible detriment.  The County also argues that no one—not even the court—noticed the witnesses in the courtroom, and when they did, they were asked to promptly leave.  Then, the County asserts, the court made a thoughtful and reasoned decision when it refused to strike their testimony.

---

[10] Parties (and courts) commonly—and mistakenly—refer to the "sequestration" of parties, witnesses, or others, when the statute at issue addresses the "Exclusion of witnesses." WISCONSIN STAT. § 906.15(1) states that "[a]t the request of a party, the judge or a circuit court commissioner shall order witnesses excluded so that they cannot hear the testimony of other witnesses."  Section 906.15(3) provides that "[t]he judge or circuit court commissioner may direct that all excluded and non-excluded witnesses be kept separate until called and may prevent them from communicating with one another until they have been examined or the hearing is ended." Those are appropriate legislative directives given that the definition of "exclude" means "to prevent or restrict the entrance of" and "to bar from participation, consideration, or inclusion" while "sequester" means "to set apart." *Exclude*, THE MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/exclude (Feb. 16, 2023); *Sequester*, *id.*, https://www.merriam-webster.com/sequester (Feb. 5, 2023).  Sequestration is more appropriately used when witnesses or jurors are not allowed to return to their homes, but are instead "set apart" at a hotel or other lodging.  Accordingly, this court will use exclusion order in lieu of sequestration order.

¶45     The trial court did not inappropriately cut off discussion when it allowed the sidebar that resulted in the PCTs leaving the courtroom.  The court did not "blame" defense counsel for not objecting earlier; it merely explained that no one had noticed the men entering the room.  The court did conduct a thorough review of the testimony the men likely heard and determined that it was not duplicative of Cooke's testimony because Bales mentioned the spitting incident almost in passing in direct examination.  This court concludes that the trial court did not erroneously conclude that there was limited peril by the slight violation of the order of exclusion.  Cooke was a primary witness to the spitting incident.  He was not filling in the holes of Bales's testimony, but rather testifying about his first-hand observations.  There was no error here, and J.D.J.'s final argument is without merit.

## CONCLUSION

¶46     Based upon the foregoing, this court concludes that none of J.D.J.'s arguments on appeal warrant reversal.  J.D.J. received a fair trial on his initial commitment.  The trial court did not erroneously exercise its discretion when it refused to strike hearsay testimony of Bales and Miller regarding J.D.J.'s dangerousness; or the admission thereof was harmless error.  The County properly impeached J.D.J. with his prior convictions.  The court also reasonably exercised its discretion when it refused to strike testimony that J.D.J. argues was suggestive of his status as a prisoner and when it allowed the PCTs to testify despite their violation of the pretrial ruling on exclusion.

¶48     Accordingly, this court affirms both the civil commitment order and the order for involuntary medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.